STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION AND RUFUS L. EDMISTEN, ATTORNEY GENERAL v. MEBANE HOME TELEPHONE COMPANY

No. 7710UC349

(Filed 21 March 1978)

1. **Telecommunications § 1.6; Utilities Commission § 6— telephone company— property used and useful in providing service**

Finding by the Utilities Commission that petitioner telephone company had excess plant investment consisting of 1000 lines and terminals which was not used and useful in rendering telephone service and which should therefore be excluded in arriving at the rate base was supported by substantial, competent evidence where such evidence tended to show that the decision to expand petitioner's central office capacity was made by the management of the company in 1973; in September of that year an order was placed for central office equipment consisting of 5500 new lines; the decision to expand was made because the economy was thriving and an influx of new industries was anticipated; the petitioner used a growth rate of 400 main stations per year in planning the capacity of the new central office, but there was no historical support for a growth rate that high; after the order was placed the economy

Utilities Comm. v. Telephone Co.

began to decline and public needs failed to meet the expected growth rate; and petitioner was given the opportunity to modify its order to 4500 lines but decided that the insignificant savings to be derived from dropping 1000 lines from the order was offset by the reduced price at which the lines could be purchased as a part of the larger order.

2. **Telecommunications § 1.4; Utilities Commission § 6— telephone company—fair value—debt-equity ratio**

In determining the fair market value of a telephone company's property, the Utilities Commission did not err in using a weighting process based on a debt-equity ratio, since the Commission took into consideration each of the indicators of fair value stated in G.S. 62-133(b)(1).

3. **Telecommunications § 1.8; Utilities Commission § 6— telephone company—fair rate of return**

Finding by the Utilities Commission that a return of 14.76% on original cost common equity would be fair and reasonable to a telephone company was supported by competent evidence where the evidence tended to show that the Commission arrived at that particular rate by considering the cost of equity capital, and the cost of equity capital was determined by using the cost of equity of larger telephone companies as a starting point, taking into consideration the differences and adjusting accordingly.

APPEAL by petitioner from order of the North Carolina Utilities Commission entered 4 March 1977. Heard in the Court of Appeals 9 February 1978.

Mebane Home Telephone Company is a public utility based in Mebane, North Carolina, providing telephone service for parts of Alamance and Orange Counties, an area encompassing 150 square miles. On 13 August 1976 the company filed a petition with the Utilities Commission proposing rate increases for its services. Beginning on 4 January 1977 the Commission held a public hearing to consider the petition, and the Attorney General was recognized as an intervenor on behalf of the consuming public. Subsequent to the hearing the Commission made findings of fact which are summarized and quoted as follows:

The local service rates currently charged by the petitioner were established by the Commission on 9 March 1966. The proposed increase in rates would produce $340,061 in additional revenues for petitioner. At present the petitioner provides adequate service to its customers.

5. That as of December 31, 1976, the Company had excess plant investment consisting of 1,000 lines and terminals

amounting to $175,639, which was not used and useful in rendering telephone service.

. . .

10. That the fair value of Mebane Home's plant used and useful in providing telephone service in North Carolina should be derived by giving 9/10 weighting to the reasonable original cost less depreciation of Mebane Home's plant in service and 1/10 weighting to the depreciated replacement cost of Meband Home's plant. Using this method, with the depreciated original cost of $3,946,594 and the depreciated replacement cost of $4,244,361, the Commission finds that the fair value of Mebane Home's utility plant in North Carolina is $3,976,371. This fair value includes a reasonable fair value increment of $29,777.

11. That the fair value of Mebane Home Telephone Company's plant in service to its customers in North Carolina at the end of the test year of $3,976,371, plus the reasonable allowance for working capital of $73,355 and the investment in Rural Telephone Bank Class B stock of $118,500, yields a reasonable fair value of Mebane Home's property in service to North Carolina customers of $4,168,226.

. . .

17. That the Company's proper embedded cost of total debt is 3.56%. The fair rate of return which should be applied to the fair value rate base is 4.40%. This return on Mebane Home's fair value property of 4.40% will allow a return on fair value equity of 13.80% after recovery of the embedded cost of debt. A return of 13.80% on fair value equity results in a return of 14.76% on original cost common equity.

In order for the petitioner to realize a fair return of 4.40% it should be allowed an increase in annual revenues of $151,135, "based upon the fair value of its property and reasonable test year operating revenues and expenses as heretofore determined."

On the basis of these findings the Commission submitted a schedule of rates and charges which would generate the $151,135 in additional annual revenues. From an order granting to the petitioner the limited rate increases, the petitioner appealed.

*Boyce, Mitchell, Burns & Smith, by F. Kent Burns and James M. Day, for Mebane Home Telephone Company, appellant.*

*Attorney General Edmisten, by Special Deputy Attorney General Robert P. Gruber, for the Using and Consuming Public, appellee.*

*Commission Attorney Edward B. Hipp and Associate Commission Attorney Antoinette R. Wike, for North Carolina Utilities Commission.*

HEDRICK, Judge.

Under Chapter 62 of the North Carolina General Statutes the Utilities Commission is vested with the authority to establish rates for public utilities "as shall be fair both to the public utility and to the consumer." G.S. 62-133(a). At any preceeding in consideration of a rate proposal by a public utility, "the burden of proof shall be upon the public utility to show that the changed rate is just and reasonable." G.S. 62-134(c). The decision of the Commission will be upheld by this Court on appeal unless it is assailable on one of the grounds enumerated in G.S. 62-94(b).

[1] By its first assignment of error the petitioner contends that the finding of the Commission that "the Company had excess plant investment consisting of 1,000 lines and terminals" which should be excluded from the determination of original cost, replacement cost and fair value was not supported by competent evidence and was therefore arbitrary and capricious. The decision to expand its central office capacity to its present level was made by the management of the company in 1973. Pursuant to this decision, in September of 1973 an order was placed for central office equipment consisting of 5,500 new lines. The petitioner argues that this decision was reasonable in light of the following conditions which prevailed at the time it was made:

In 1973 a thriving economy accompanied by an influx of new industries prompted a projected growth rate by the company of 400 main stations per year. Based on this growth rate and an engineering interval of 24-28 months the company determined that 5,500 new lines would be needed in the near future. However, shortly after the placement of the order the economy began to decline and public needs failed to meet the expected

growth rate. The petitioner was given the opportunity to modify its order to 4,500 lines but decided that the insignificant savings to be derived from dropping 1,000 lines from the order was offset by the reduced price at which the lines could be purchased as a part of the larger order.

The Commission's finding of excessive investment was based on the following testimony of its staff investigator, Benjamin R. Turner, Jr.:

> [B]ased on a forecasted growth rate of 250 main stations per year and a reasonable engineering interval for new additions of one year, the new Crossreed ESC-1 PL2 Electronic Switching Center is equipped with an excess plant margin equal to 1,000 lines which is not used and useful in providing telephone service. This is equal to an excess plant investment of $151,000. The Company used a growth rate of 400 main stations per year in planning the capacity of the new central office. At the time the Company was planning construction of the new central office, the annual growth rate was equal to 265 main stations, new housing developments were planned and Mebane was generally regarded as a good location for new business; however, these factors do not justify a growth rate of 400 main stations per year. Particularly because there is no historical support for growth rate that high. For example, the annual growth rate was 156 in 1968, 130 in 1969, 111 in 1970, 163 in 1971, 265 in 1972, and 161 in 1973. The highest growth occurred in 1972 the year before the order for the new central office was placed. The order was placed in September 1973 after the growth rate had fallen to a level of 161 new main stations per year. This should have been an indication to the Company that the forecasted growth rate of 400 main stations per year was in need of a downward adjustment.

> It is interesting to note that after the order was placed the growth rate continued to decline and yet no adjustment was made in the planned capacity of the new central office.

> . . .

> As to why a one year interval was used in computing excess margin in this case, additions to the Stromberg-Carlson

ESC-1 PL2 central office require a maximum of 10 weeks to engineer and an additional 30 weeks for installation after receipt of the order. Based on these factors, a maximum reasonable engineering period for additions to an office of this type should be one year.

The principles guiding our review of the Commission's findings were thoroughly discussed in *State ex rel. North Carolina Utilities Commission v. General Telephone Co.,* 281 N.C. 318, 352-3, 189 S.E. 2d 705, 727 (1972):

[A] public utility is under a present duty to anticipate, within reason, demands to be made upon it for service in the near future. [Citations omitted.] Substantial latitude must be allowed the directors of the utility in making the determination as to what plant is presently required to meet the service demand of the immediate future, since construction to meet such demand is time consuming and piecemeal construction programs are wasteful and not in the best interests of either the ratepayers or the stockholders. [Citations omitted.] However, Commission action deleting excess plant from the rate base is not precluded by a showing that present acquisition or construction is in the best interests of the stockholders. The present ratepayers may not be required to pay excessive rates for service to provide a return on property which will not be needed in providing utility service within the reasonable future.

Assuming that the purchase of the additional 1,000 lines represented a savings to the stockholders, the evidence is sufficient to support the Commission's finding that the excess plant investment was "not used and useful in rendering telephone service." Thus, "[t]he Commission's determination, supported by substantial evidence, may not properly be set aside by the reviewing court merely because a different conclusion could have been reached upon the evidence." *State ex rel. North Carolina Utilities Commission v. General Telephone Co., supra* at 354, 189 S.E. 2d at 728.

[2] Petitioner's second assignment of error challenges the Commission's determination of the fair value of the company's property. In determining the fair value of the petitioner's property, the Commission utilized a weighting process based on the debt-equity

ratio of the capital structure of the company which gave "9/10 weighting to the reasonable original cost less depreciation of Mebane Home's plant in service and 1/10 weighting to the depreciated replacement cost of Mebane Home's plant." The petitioner contends that the Commission erred in its "blind application of a predetermined formula" which has no relation to the fair value of the property and permits only minimal consideration of replacement cost.

According to G.S. 62-133(b)(1) "the fair value of the public utility's property used and useful in providing the service rendered to the public" should be ascertained by the Commission with due consideration to the original cost less depreciation, the replacement cost, and any other relevant factors. Upon review of the Commission's determination we must defer to the expertise of that administrative body as to the credibility and import of the evidence presented. *State ex rel. North Carolina Utilities Commission v. Virginia Electric & Power Co.*, 285 N.C. 398, 206 S.E. 2d 283 (1974). This Court will not upset the Commission's conclusions "merely because it would have given a different weight to each of the indicators of 'fair value.'" *State ex rel. North Carolina Utilities Commission v. Duke Power Co.*, 285 N.C. 377, 390, 206 S.E. 2d 269, 278 (1974). "But if it is clear from the record that the Commission reached its finding of 'fair value' by disregarding or giving 'minimal' consideration to one of the . . . factors, its finding of the ultimate fact of 'fair value' may be set aside by the court on the ground of error of law in such ascertainment." *State ex rel. North Carolina Utilities Commission v. General Telephone Co., supra* at 358-9, 189 S.E. 2d at 731.

In the present case the Commission included in its order the rationale underlying its use of the debt-equity ratio in computing the fair value of the property. The Commission concluded that in order to take into account "the degree to which the Company should be compensated for inflation" it is necessary to weight original cost and replacement cost roughly correspondent with the debt and equity portions of the capital structure. We think that the debt-equity ratio was a relevant factor to be taken into consideration and injected into the weighting process. The order of the Commission reflects due consideration of each of the indicators of fair value. In this regard, *General Telephone Company,* in which the Supreme Court reversed the Commission for

giving minimal consideration to replacement cost, is clearly distinguishable since in that case the Commission "failed to set forth its finding of the 'replacement cost,' depreciated." *State ex rel. North Carolina Utilities Commission v. General Telephone Co., supra* at 359, 189 S.E. 2d at 731. We find no error in the reasoning and means employed by the Commission to ascertain the fair value of the company.

[3] By its third assignment of error the petitioner contends that the Commission's determination of the fair rate of return was not supported by competent evidence. In the pertinent finding the Commission found that a return of 14.76% on original cost common equity would be fair and reasonable.

> The Commission is authorized by G.S. 62-133(b)(4) to [f]ix such rate of return on the fair value of the property as will enable the public utility by sound management to produce a fair profit for its stockholders, considering changing economic conditions and other factors, as they then exist, to maintain its facilities and services in accordance with the reasonable requirements of its customers . . . and to compete in the market for capital funds on terms which are reasonable and which are fair to its customers and to its existing investors.

It is the Commission's duty to sift through the evidence and draw a conclusion therefrom as to a fair and reasonable rate of return. If there is competent evidence to support the findings and conclusions of the Commission, they will be upheld by the reviewing court. *State ex rel. North Carolina Utilities Commission v. General Telephone Co., supra.*

The only evidence offered, bearing on the rate of return, was the testimony of H. Randolph Currin, Jr., a Senior Operations Analyst for the Utilities Commission. Currin first testified that "a rate of return based on the operating expenses and the cost of capital will allow the company to meet its service and financial obligations and to establish a sufficiently sound reputation to attract future investors." Currin further testified that since there is no way to determine a market price for shares of a small company such as Mebane Home, the cost of equity capital must be ascertained by indirect means. While noting differences between Mebane Home and several larger companies, Currin used the cost of equity of the larger companies, 12.75%, as a "minimum starting

point" towards determining the cost of equity capital of Mebane Home. Currin concluded as follows:

> Since an investment in Mebane Home is presumably riskier, potential equity investors in Mebane Home will require some extra risk premium in addition to the base 12.75%.

> Though the Company is highly leveraged, Mebane Home's extra risk premium should be moderate, probably in the neighborhood of 2.0%-3.0%. Mebane Home's risk premium should be moderate for several reasons.

> Mebane Home has qualified for loans from the Rural Electrification Administration. Thus, the Company has not been forced to sell bonds in the capital markets, where 5 years ago they might have had to offer interest rates of 10% or more, and where, 18 months ago they probably would not have been able to sell bonds at any interest rate. Instead, the Company has been able to finance its construction with 35 year, REA notes, historically, at an interest rate of only 2%, and more recently, at a rate of 5.5%, resulting in an embedded cost of debt of only 3.56%.

> It is a fact that leverage, per se, increases the variability of returns to the equity holders, and that risk generally increases as the variability, or leverage, increases. Though Mebane Home is highly leveraged, as long as its return on investment is greater than 3.56%, the Company's stockholders benefit from favorable leverage. Assuming that Mebane Home's return on investment will, in the next few years, always be greater than its embedded cost of debt, and it always has been, then there is no increased risk to its stockholders associated with the high degree of leverage. On the contrary, in each year subsequent to 1961, Mebane Home's stockholders have earned more on their investment, than they would have with less leverage. Since 1970, the average return on equity has been 23.5%, with a high of 28.7%.

> In addition to the very low interest rates, and the associated benefits of high leverage, the Company recognizes other benefits from its affiliation with the REA.

> . . .

As to the conclusion I reached as to the cost of equity capital and the total cost of capital for Mebane Home, adding the 2.0%-3.0% risk premium to the 12.75% base cost of equity, results in a cost of equity for Mebane Home in the 14.75%-15.75% range.

The petitioner contends that there is no basis of comparison between Mebane Home and the larger companies to which Currin referred in his testimony. In his testimony Currin pointed out that the larger companies because of their greater resources present fewer risks to potential investors and thus can attract investors with a lower expected return. For this reason the cost of equity capital to the larger companies was used only as a minimum to which the risk premium of the smaller company could be added. Since no direct means of computing the cost of equity capital of Mebane Home was available, we think that it was proper to use the rates of larger companies as a starting point, taking into consideration the differences and adjusting accordingly. The findings and conclusions of the Commission as to the rate of return are supported by competent evidence.

The order of the Utilities Commission is affirmed.

Affirmed.

Judges BRITT and WEBB concur.