STATE Ex Rel. UTIL. COMM'N v. CAROLINA UTIL. CUSTOMERS ASS'N

[348 N.C. 452 (1998)]

STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION; PENNSYLVANIA & SOUTHERN GAS COMPANY, A DIVISION OF NUI CORPORATION; AND PUBLIC STAFF-NORTH CAROLINA UTILITIES COMMISSION v. CAROLINA UTILITY CUSTOMERS ASSOCIATION, INC.

No. 22A96

(Filed 9 July 1998)

**1. Utilities § 185 (NCI4th)— just and reasonable rate of return—factors**

What is a "just and reasonable" rate of return depends upon a determination and examination of several variables, including: (1) the rate base which earns the return; (2) the gross income received by the applicant from its authorized operations; (3) the amount to be deducted for operating expenses, which must include the amount of capital investment currently consumed in rendering the service; and (4) what rate constitutes a just and reasonable rate of return on the predetermined rate base.

**2. Utilities § 181 (NCI4th)— fair rate of return—conclusion of law—factual findings**

What constitutes a fair rate of return on common equity is a conclusion of law that must be predicated on adequate factual findings.

**3. Utilities § 232 (NCI4th)— nonunanimous stipulation—consideration by Utilities Commission**

A stipulation entered into by less than all of the parties as to any facts or issues in a contested case proceeding under Chapter 62 should be accorded full consideration and weighed by the Utilities Commission with all other evidence presented by any of the parties in the proceeding. The Commission may adopt the recommendations or provisions of the nonunanimous stipulation as long as the Commission sets forth its reasoning and makes its own independent conclusion supported by substantial evidence on the record that the proposal is just and reasonable to all parties in light of all the evidence presented.

**4. Utilities § 232 (NCI4th)— unanimous stipulation—informal disposition of rate case**

Only those stipulations that are entered into by all of the parties before the Utilities Commission may form the basis of

STATE Ex Rel. UTIL. COMM'N v. CAROLINA UTIL. CUSTOMERS ASS'N

[348 N.C. 452 (1998)]

informal disposition of a contested proceeding under N.C.G.S. § 62-69(a).

**5. Utilities § 232 (NCI4th)— return on equity—adoption of rate in nonunanimous stipulation—failure to make independent determination**

The Utilities Commission erred in finding the 11.4% rate of return on common equity specified in a nonunanimous stipulation by a gas company and the public staff in a natural gas rate case where it is clear that the Commission merely adopted, without analysis or deduction, the 11.4% rate set forth in the stipulation rather than considering the stipulation as one piece of evidence to be weighed in making an otherwise independent determination as to the appropriate rate of return.

**6. Utilities § 196 (NCI4th)— rate case—cost of service to customer classes—material fact**

Cost of service to the various customer classes is a material fact in a natural gas general rate case because (1) the utility's cost of providing service to each of its customer classes is an integral part of the formula for determining the appropriate rates of return for each customer class as it pertains to the ordered rate design, and (2) cost of service must be examined in reviewing whether there is unjust discrimination in rate design among classes of customers under N.C.G.S. § 62-140.

**7. Utilities § 196 (NCI4th)— natural gas rate case—cost of service for various classes—insufficient findings**

Findings by the Utilities Commission in a natural gas rate case with regard to cost of service for the various classes of customers lacked analysis and were insufficient to enable the appellate court to properly review the ordered rate design where the only determination regarding the cost of service calculation was a finding that the cost of service studies presented in this proceeding show that somewhat higher rates of return exist under the filed and stipulated proposed rates for Large General and Interruptible customers than for Residential customers and that the rate of return for Residential customers is below the total company returns; the findings do not establish the magnitude of the differences among the rates of return provided by the various customer classes; the findings do not set forth the existing rate differences with respect to the cost of serving the several customer classes; and the Commission's characterization of indus-

trial class rates as "somewhat higher" under the stipulated rates is not only vague but is arguably contrary to the evidence.

**8. Utilities § 198 (NCI4th)— rate case—full margin transportation rates**

A gas company's use of full margin transportation rates was proper as a matter of law where those rates were supported by competent, material and substantial evidence in view of the entire record.

Appeal as of right by intervenor-appellant Carolina Utility Customers Association pursuant to N.C.G.S. § 7A-29(b) from a final order of the Utilities Commission in a general rate case granting applicant-appellee Pennsylvania & Southern Gas Company a partial rate increase. Heard in the Supreme Court 10 September 1996.

*Amos & Jeffries, L.L.P., by James H. Jeffries IV, for applicant-appellee Pennsylvania & Southern Gas Company.*

*Robert P. Gruber, Executive Director, by James D. Little, Staff Attorney, for intervenor-appellee Public Staff.*

*Byrd, Byrd, Ervin, Whisnant, McMahon & Ervin, P.A., by Sam J. Ervin, IV, for intervenor-appellant Carolina Utility Customers Association, Inc.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by James Y. Kerr, II, on behalf of BellSouth Telecommunications, Inc.; and Dwight W. Allen, Vice President and General Counsel, on behalf of Carolina Telephone & Telegraph Company, amici curiae.*

*Hunton & Williams, by Edward S. Finley, Jr., on behalf of North Carolina Natural Gas Corporation; and Les S. Anthony, Associate General Counsel, on behalf of Carolina Power & Light Company, amici curiae.*

*Michael F. Easley, Attorney General, by Alan S. Hirsch, Special Deputy Attorney General, and Karen E. Long, Assistant Attorney General, on behalf of the Attorney General, amicus curiae.*

LAKE, Justice.

On 17 February 1995, applicant-appellee Pennsylvania & Southern Gas Company, a division of NUI Corporation and doing

business as North Carolina Gas Service ("the Company"), filed an application with the North Carolina Utilities Commission seeking a $773,503 increase in annual gross revenues and approval of a mechanism for the future recovery of manufactured gas plant costs. On 14 March 1995, the Commission entered an order setting the Company's application for investigation and hearing and declared this case a general rate case pursuant to N.C.G.S. § 62-137. Subsequently, the Commission by order allowed the formal intervention of Carolina Utility Customers Association, Inc. ("CUCA"). The intervention and participation of the Public Staff-North Carolina Utilities Commission ("Public Staff") was recognized pursuant to statute.

On 14 June 1995, the Company and the Public Staff filed a stipulation resolving all revenue requirements and rate design issues raised by the Company's application. The parties to the stipulation agreed that the Company should be granted an annual rate increase of $384,771, that the Company should be allowed to earn an 11.4% return on common equity, and that certain "proposed rates [were] just and reasonable to all customer classes." CUCA did not join in this stipulation and opposed certain provisions contained therein. This matter came on for hearing before the Commission on 27 June 1995.

At that hearing, the Company offered the direct, supplemental and rebuttal testimonies of James W. Carl, its vice president; Robert F. Lurie, the treasurer of NUI Corporation; and Bernard L. Smith, the vice president of accounting for the Company. On direct, Mr. Carl testified regarding the Company's cost of service and several studies allocating costs to the Company's various customer classes and determining the rate of return on those classes. On the basis of these studies, Mr. Carl made recommendations for the design of rates. In his supplemental testimony, Mr. Carl explained the negotiation procedures with the Public Staff and identified the various changes to the Company's filed case that were incorporated into the stipulation as a result of negotiations with the Public Staff. Mr. Lurie, on direct examination, testified that he had performed a discounted cash flow analysis of the projected costs of capital for the Company. Based on this study, Mr. Lurie's initial recommendation for a return on equity for the Company was 13.34%.

CUCA offered the testimony of Kevin W. O'Donnell, a consultant in the field of utility regulation. Mr. O'Donnell testified that with respect to the Company's cost of equity capital, he had performed

both a discounted cash flow analysis and a comparable earnings analysis, and based on these studies, the Company's cost of equity capital was 10.4%. Mr. O'Donnell further testified regarding cost of service and rate design. He criticized Mr. Carl's cost-of-service studies and stated that, in his opinion, rates should be based strictly on cost, that the rate design put forth by the Company did not reflect this approach, and that rates of return for the various customer classes essentially should be equalized over time. Finally, Mr. O'Donnell criticized the Company's continued use of "full margin" transportation rates. In his supplemental testimony, Mr. O'Donnell testified that a 0.15% flotation factor should be added to his original return on equity recommendation so as to allow the Company to earn 10.55% on equity.

On rebuttal, Mr. Carl testified regarding problems with the cost-of-service analysis performed by Mr. O'Donnell and the practical difficulties associated with Mr. O'Donnell's recommendation for levelized rates of return for each customer class. Mr. Carl further testified that the Company should be allowed to continue using "full margin" transportation rates. Mr. Lurie testified on rebuttal that the stipulated rate of return on equity of 11.4% was just and reasonable.

On 20 September 1995, the Commission approved the stipulated revenue requirement and rate design and entered an order granting a partial rate increase. In reaching its decision, the Commission concluded: (1) that the cost of the Company's equity capital was 11.4%; (2) that "[i]t is not appropriate to set rates in this proceeding based solely on any one or more of the estimated cost-of-service studies presented by CUCA and Pennsylvania & Southern"; (3) that the stipulated rate design was "just and reasonable for purposes of this proceeding and [did] not subject any customer or class of customers to rate shock or unjust or discriminatory rates"; and (4) that the Company's transportation rates should continue to be established on a "full margin" basis.

CUCA appeals to this Court contending the Commission committed reversible error by (1) adopting a return on equity of 11.4%, the return specified in said stipulation; (2) failing to adopt a single cost-of-service study for use in designing rates; and (3) approving the continued use of "full margin" transportation rates by the Company. For the reasons stated herein, we reverse the decision of the North Carolina Utilities Commission and remand this case for further proceedings not inconsistent with this decision.

STATE Ex REL. UTIL. COMM'N v. CAROLINA UTIL. CUSTOMERS ASS'N

[348 N.C. 452 (1998)]

The goals, policies and principles underlying the Commission's regulation of public utilities, and its concomitant duties pursuant thereto, are well established in the statutory and case law of this state. This Court emphasized and summarized these fundamental principles of public utility law in *State ex rel. Util. Comm'n v. General Tel. Co. of Southeast*, 281 N.C. 318, 189 S.E.2d 705 (1972), wherein the Court stated:

> [T]he Legislature has conferred upon the Utilities Commission the power to police the operations of the utility company so as to require it to render service of good quality at charges which are reasonable. G.S. 62-31; G.S. 62-32; G.S. 62-130; and G.S. 62-131. These statutes confer upon the Commission, not upon this Court or the Court of Appeals, the authority to determine the adequacy of the utility's service and the rates to be charged therefor.
>
>     . . . In fixing rates to be charged by a public utility, the Commission is exercising a function of the legislative branch of the government. . . . The Commission, however, does not have the full power of the Legislature but only that portion conferred upon it in G.S. Chapter 62. In fixing the rates to be charged by a public utility for its service, the Commission must, therefore, comply with the requirements of that chapter, *more specifically, G.S. 62-133.*

*General Tel.*, 281 N.C. at 335-36, 189 S.E.2d at 717 (emphasis added). In this regard, N.C.G.S. § 62-81(a) provides in relevant part:

> All cases or proceedings, declared to be or properly classified as general rate cases under G.S. 62-137, or any proceedings which will substantially affect any utility's overall level of earnings or rate of return, shall be set for trial or hearing by the Commission . . . . *All such cases or proceedings shall be tried or heard and decided in accordance with the rate-making procedure set forth in G.S. 62-133 . . . .*

N.C.G.S. § 62-81(a) (1989) (emphasis added). Thus, the Commission must comply with the overall requirements of regulation established and specified in considerable detail by the Legislature in chapter 62 of the General Statutes. *General Tel.*, 281 N.C. at 336, 189 S.E.2d at 717. While public utilities are subject to such regulation, in all other respects they are private, investor-owned companies, and they must be allowed to attract from volunteer investors, within our free enterprise system, such additional capital as is periodically required for

the expansion or improvement of services. *Id.* at 337, 189 S.E.2d at 718. Utilities accomplish this by offering their shareholders and other potential investors the opportunity to earn a return on investment that, in light of the potential risk, outweighs or is at least comparable to returns available in other investment options. *Id.*

In order to meet the twin goals of assuring sufficient shareholder investment in utilities while simultaneously maintaining the lowest possible cost to the using public for quality service, the Legislature set forth in section 62-133 the precise steps the Commission must follow in fixing rates in a general rate case such as the one at bar. *General Tel.*, 281 N.C. at 335-37, 189 S.E.2d at 717-18. This statute provides in part:

### § 62-133. How rates fixed.

(a) In fixing the rates for any public utility . . . , the Commission shall fix such rates as shall be fair both to the public utilities and to the consumer.

(b) In fixing such rates, the Commission shall:

(1) Ascertain the reasonable original cost of the public utility's property used . . . in providing the service rendered to the public . . . .

. . . .

(2) Estimate such public utility's revenue under the present and proposed rates.

(3) Ascertain such public utility's reasonable operating expenses . . . .

(4) Fix such rate of return on the cost of the property ascertained . . . as will enable the public utility by sound management to produce a fair return for its shareholders, . . . to maintain its facilities and services . . . , and to compete in the market for capital funds on terms which are reasonable and which are fair to its customers and to its existing investors.

. . . .

(5) Fix such rates to be charged by the public utility as will earn in addition to reasonable operating expenses ascer-

tained . . . the rate of return fixed . . . on the cost of the public utility's property . . . .

. . . .

(d) The Commission shall consider all other material facts of record that will enable it to determine what are reasonable and just rates.

N.C.G.S. § 62-133 (Supp. 1997). The Commission's ultimate goal in setting rates is to determine what constitutes a reasonable charge for services proposed to be rendered in the immediate future. *State ex rel. Util. Comm'n v. Morgan*, 277 N.C. 255, 267, 177 S.E.2d 405, 413 (1970). The determination of this question is for the Commission, in accordance with the direction of this section. *Id.*

The rates fixed by the Commission are deemed *prima facie* just and reasonable. N.C.G.S. §§ 62-94(e), -132 (1989). The decision of the Commission will be upheld on appeal unless it is assailable on one of the statutory grounds enumerated in section 62-94(b). *State ex rel. Util. Comm'n v. Mebane Home Tel. Co.*, 35 N.C. App. 588, 591, 242 S.E.2d 165, 166 (1978), *aff'd*, 298 N.C. 162, 257 S.E.2d 623 (1979). Section 62-94 provides in relevant part:

(b) So far as necessary to the decision and where presented, the court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action. The court may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

(1) In violation of constitutional provisions, or

(2) In excess of statutory authority or jurisdiction of the Commission, or

(3) Made upon unlawful proceedings, or

(4) Affected by other errors of law, or

(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or

(6) Arbitrary or capricious.

(c) In making the foregoing determinations, the court shall review the whole record or such portions thereof as may be cited by any party and due account shall be taken of the rule of prejudicial error. The appellant shall not be permitted to rely upon any grounds for relief on appeal which were not set forth specifically in his notice of appeal filed with the Commission.

N.C.G.S. § 62-94(b), (c).

This Court's role under section 62-94(b) is not to determine whether there is evidence to support a position the Commission did not adopt. *State ex rel. Util. Comm'n v. Eddleman*, 320 N.C. 344, 355, 358 S.E.2d 339, 347 (1987). Instead, the test upon appeal is whether the Commission's findings of fact are supported by competent, material and substantial evidence in view of the entire record. *State ex rel. Util. Comm'n v. Nantahala Power & Light Co.*, 313 N.C. 614, 745, 332 S.E.2d 397, 474 (1985), *rev'd on other grounds*, 476 U.S. 953, 90 L. Ed. 2d 943 (1986). "Substantial evidence [is] defined as 'more than a scintilla or a permissible inference.' " *State ex rel. Util. Comm'n v. Southern Coach Co.*, 19 N.C. App. 597, 601, 199 S.E.2d 731, 733 (1973) (quoting *Util. Comm'n v. Great Southern Trucking Co.*, 223 N.C. 687, 690, 28 S.E.2d 201, 203 (1943)), *cert. denied*, 284 N.C. 623, 201 S.E.2d 693 (1974). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 83 L. Ed. 126, 140 (1938). The Commission's knowledge, however expert, cannot be considered by this Court unless the facts and findings thereof embraced within that knowledge are in the record. *State ex rel. Util. Comm'n v. Carolina Coach Co.*, 261 N.C. 384, 390-91, 134 S.E.2d 689, 695 (1964). Failure to include all necessary findings of fact is an error of law and a basis for remand under section 62-94(b)(4) because it frustrates appellate review. *State ex rel. Util. Comm'n v. Public Staff*, 317 N.C. 26, 34, 343 S.E.2d 898, 904 (1986).

## I. Return on Equity and Cost of Service

Having reiterated these foundational principles, we now turn our analysis to the Commission's order in the case *sub judice*. CUCA maintains that the Commission's order was deficient in two respects: first, the Commission's conclusion of an 11.4% rate of return on equity is unsupported by competent, material and substantial evidence; and second, the Commission failed to make sufficient findings of fact regarding the cost of service to the various classes of customers in adopting the stipulated rate design. We agree.

N.C.G.S. § 62-79(a) sets forth the standard for Commission orders against which they will be analyzed upon appeal. The statute provides:

> (a) *All final orders and decisions* of the Commission *shall be sufficient in detail* to enable the court on appeal to determine the controverted questions presented in the proceedings *and shall include*:
>
>> (1) Findings and conclusions and the reasons or bases therefor upon *all the material issues of fact, law, or discretion* presented in the record, and
>>
>> (2) The appropriate rule, order, sanction, relief or statement of denial thereof.

N.C.G.S. § 62-79(a) (1989) (emphasis added). The purpose of the required detail as to findings, conclusions and reasons as mandated by this subsection is to provide the appellate court with sufficient information with which to determine under the scope of review the questions at issue in the proceedings. *State ex rel. Util. Comm'n v. Conservation Council of N.C.*, 312 N.C. 59, 62, 320 S.E.2d 679, 682 (1984). Since the Commission is required to render its decisions upon questions of law and of fact in the same manner as a court of record, its findings must be supported by competent evidence as a matter of law. *State ex rel. Util. Comm'n v. Rail Common Carriers*, 42 N.C. App. 314, 317-18, 256 S.E.2d 508, 511 (1979). Failure to include all necessary findings of fact is an error of law and a basis for remand under section 62-94(b)(4).

## A. Rate of Return on Equity

[1] A thorough review of the record, including particularly the Commission's order, reveals that the Commission's 11.4% rate of return on equity conclusion comes directly, without any deduction, from the stipulation between the Company and the Public Staff, and thus does not meet the standards established by sections 62-79(a), -94(b) and -133. The "rate of return" on equity, the Company's outstanding common stock, is a percentage that the Commission concludes should be earned on the value of the utility's investment, commonly referred to as the "rate base." *State ex rel. Util. Comm'n v. Carolina Util. Customers Ass'n*, 323 N.C. 238, 244, 372 S.E.2d 692, 696 (1988). What is a "just and reasonable" rate of return depends upon a determination and examination of several variables, including: (1) the rate base which earns the return; (2) the gross income

received by the applicant from its authorized operations; (3) the amount to be deducted for operating expenses, which must include the amount of capital investment currently consumed in rendering the service; and (4) what rate constitutes a just and reasonable rate of return on the predetermined rate base. *State ex rel. Util. Comm'n v. State*, 239 N.C. 333, 344-45, 80 S.E.2d 133, 141 (1954).

**[2]** What constitutes a fair rate of return on common equity is a conclusion of law that must be predicated on adequate factual findings. *State ex rel. Util. Comm'n v. Public Staff*, 322 N.C. 689, 693, 370 S.E.2d 567, 570 (1988). In finding essential, ultimate facts, the Commission must consider and make its determination based upon all factors particularized in section 62-133, including "all other material facts of record" that will enable the Commission to determine what are reasonable and just rates. N.C.G.S. § 62-133; *State ex rel. Util. Comm'n v. State*, 239 N.C. 333, 344, 80 S.E.2d 133, 141; *accord State ex rel. Util. Comm'n v. Westco Tel. Co.*, 266 N.C. 450, 456, 146 S.E.2d 487, 491 (1966). The Commission must then arrive at its "*own independent conclusion*" as to the fair value of the applicant's investment, the rate base, and what rate of return on the rate base will constitute a rate that is just and reasonable both to the utility company and to the public. *State ex rel Util. Comm'n v. State*, 239 N.C. at 344, 80 S.E.2d at 141.

The Company and the Public Staff contend that, notwithstanding the dictates of chapter 62 and our case law, a relaxed standard of review should be applied on appeal where determinations contained in a Commission order are embodied in a stipulation between less than all of the parties to the dispute. These parties argue that, where a stipulation entered into by less than all of the parties is embodied in a Commission order, the order should be reviewed for reasonableness as a whole since a stipulation between adversarial parties such as the Company and the Public Staff fulfills the requirement of "substantial evidence" in N.C.G.S. § 62-94(b)(5). We hold such an interpretation and contention to be contrary to the requirements of chapter 62 and our jurisprudence in general.

N.C.G.S. § 62-69(a) empowers the Commission to resolve even general rate cases by stipulation of the parties. Section 69(a) provides in part:

> The Commission may make informal disposition of *any contested proceeding* by stipulation, agreed settlement, consent order or default.

N.C.G.S. § 62-69(a) (1989) (emphasis added). While this statute does not address directly either the question of whether all of the parties must participate in the stipulation to qualify a case for complete informal disposition, or the evidentiary weight, if any, to be given a stipulation entered into by less than all of the parties, the use of the terms "stipulation," "agreed settlement," and "consent order" clearly imply an agreement reached between *all* the contestants in the case.

To address these interrelated questions specifically, we turn to chapter 62 and persuasive case authority. In its delegation of rate-making authority to the Commission, the legislature has established an elaborate procedural, hearing, and appeals process that contemplates the full consideration of all evidence put forth by each of the parties certified via the statute to have an interest in the outcome of contested proceedings. *See, e.g.,* N.C.G.S. § 62-65(a) (1989) (*"Every party* to a proceeding shall have the right to call and examine witnesses, to introduce exhibits . . . .") (emphasis added); N.C.G.S. § 62-78(a) (1989) ("Prior to each decision . . ., *the parties* shall be afforded an opportunity to submit . . . proposed findings of fact and conclusions of law and briefs . . . .") (emphasis added); N.C.G.S. § 62-90(a) (1989) (*"Any party* to a proceeding before the Commission may appeal from any final order or decision . . . .") (emphasis added). This is particularly true of general rate cases where the whole rate structure of the applicant company is involved. In such cases, the Commission is required to apply "the rules of evidence applicable in civil actions in the superior court." N.C.G.S. § 62-65(a). Any person having a direct interest in the subject matter shall be allowed "to intervene in any pending proceeding." N.C.G.S. § 62-73 (1989). Once such considerations are afforded to all parties in a contested case, the Commission is required to embody its findings in an order sufficiently detailing the reasons for its determinations on all material and controverted issues of fact, law or discretion presented in the record. N.C.G.S. § 62-79(a). Those findings and conclusions must be supported by substantial evidence on the record as a whole. N.C.G.S. § 62-94(b).

The fact that the Commission is empowered by section 62-69(a) to resolve cases by informal disposition does not absolve it of all other provisions of chapter 62 and its formal rate-making duties therein mandated, absent full agreement of all parties to a contested case. This Court has long recognized the value of stipulations to the efficient administration of justice.

Parties undoubtedly have the right to make agreements and admissions in the course of judicial proceedings, especially when they are solemnly made and entered into and are committed to writing, and when, too, they bear directly upon the matters involved in the suit. Such agreements and admissions are of frequent occurrence and of great value, as they dispense with proof and save time in the trial of causes.

*J.L. Roper Lumber Co. v. Elizabeth City Lumber Co.*, 137 N.C. 431, 438, 49 S.E. 946, 948-49 (1905). However, this Court also recognizes that, "[w]hile this is so, *the court will not extend the operation of the agreement beyond the limits set by the parties or by the law.*" *Id.* at 439, 49 S.E. at 949 (emphasis added). In *Ingold v. City of Hickory*, 178 N.C. 614, 101 S.E. 525 (1919), this Court recognized, " 'A person may lawfully waive by agreement the benefit of a statutory provision. But there is an imputed exception to this general rule in the case of a statutory provision[] whose waiver would violate public policy expressed therein, or where rights of third parties[] which the statute was intended to protect[] are involved.' " *Id.* at 617, 101 S.E. at 527 (quoting 9 Cyc. 480 (1903)).

Chapter 62 contemplates a full and fair examination of evidence put forth by *all* of the parties. To allow the Commission to dispose of a contested rate case by stipulation of less than all certified parties would effectively absolve the Commission of its statutory and due process obligations to afford all parties a fair hearing. As perceptively enunciated by the Texas Court of Appeals:

The adoption of a non-unanimous stipulation raises several due-process concerns. The most obvious is the possibility that opposing parties may be denied an opportunity to present evidence against acceptance of the stipulation. A more subtle problem is the possibility of an unintentional shift of the burden of proof from the utility to the opponents of the stipulation. There is a danger that when presented with a ready-made solution, the Commission might unconsciously require that the opponents refute the agreement, rather than require the utility to prove affirmatively that the proposed rates are just and reasonable. This danger is increased when the Commission staff is a signatory party and is in a position of advocating the stipulation.

*Cities of Abilene v. Public Util. Comm'n*, 854 S.W.2d 932, 938-39 (Tex. Ct. App. 1993), *rev'd in part on other grounds*, 909 S.W.2d 493 (Tex. 1995).

In analyzing the evidentiary weight to be given a nonunanimous stipulation, we find particularly persuasive the reasoning of the United States Supreme Court in *Mobil Oil Corp. v. Federal Power Comm'n*, 417 U.S. 283, 41 L. Ed. 2d 72 (1974). In *Mobil Oil*, the Supreme Court approved the manner in which the Federal Power Commission ("the FPC") examined a nonunanimous stipulation as simply one piece of evidence among many to be considered by the FPC. The Supreme Court stated:

> The Commission clearly had the power to admit the agreement into the record—indeed, it was obliged to consider it. That it was admitted for the record did not, of course, establish without more the justness and reasonableness of its terms. But the Commission did not treat it as such. As we have noted, the Commission weighed its terms by reference to the entire record . . . and further supplemented that record with extensive testimony and exhibits directed at the proposal's terms. We think that the Court of Appeals correctly analyzed the situation and stated the correct legal principles:
>
> > "No one seriously doubts the power—indeed, the duty—of [the] FPC to consider the terms of a proposed settlement which fails to receive unanimous support as a decision on the merits. We agree with the DC Circuit that even 'assuming that under the Commission's rules [a party's] rejection of the settlement rendered the proposal ineffective *as a settlement*, it could not, and we believe should not, have precluded the Commission from considering the proposal *on its merits.*' "
>
> > . . . .
>
> > "As it should [the] FPC is employing its settlement power . . . to further the resolution of area rate proceedings. If a proposal enjoys unanimous support from all of the immediate parties, it could certainly be adopted as a settlement agreement if approved in the general interest of the public. But even if there is a lack of unanimity, it may be adopted as a resolution *on the merits,* if [the] FPC makes an independent finding supported by 'substantial evidence on the record as a whole' that the proposal will establish 'just and reasonable' rates for the area."

The choice of an appropriate structure for the rate order is a matter of Commission discretion, to be tested by its effects. The

choice is not the less appropriate because the Commission did not conceive of the structure independently.

*Mobil Oil*, 417 U.S. at 312-14, 41 L. Ed. 2d at 97-98 (citations omitted) (footnotes omitted).

[3],[4] Thus, we hold that a stipulation entered into by less than all of the parties as to any facts or issues in a contested case proceeding under chapter 62 should be accorded full consideration and weighed by the Commission with all other evidence presented by any of the parties in the proceeding. The Commission must consider the nonunanimous stipulation along with all the evidence presented and any other facts the Commission finds relevant to the fair and just determination of the proceeding. The Commission may even adopt the recommendations or provisions of the nonunanimous stipulation as long as the Commission sets forth its reasoning and makes "its own independent conclusion" supported by substantial evidence on the record that the proposal is just and reasonable to all parties in light of all the evidence presented. Only those stipulations that are entered into by all of the parties before the Commission may form the basis of informal disposition of a contested proceeding under section 62-69(a).

Our holding in this respect should not be interpreted as either express or tacit disapproval of informal disposition of proceedings through negotiation. Quite the contrary, this Court recognizes the crucial role that informal disposition plays in quickly and efficiently resolving many contested proceedings and encourages all parties to seek such resolution through open, honest and equitable negotiation. Our decision here merely recognizes that such negotiation and settlement is subversive of due process and the legislative authority delegated to the Commission if it lacks representation of all the parties with a certified interest in the outcome of the proceeding.

[5] Applying the foregoing principles to the case *sub judice*, it is evident that the Commission's adoption of the 11.4% rate of return on equity embodied in the nonunanimous stipulation does not meet the standards established by section 62-133 and chapter 62 as a whole. The stipulated 11.4% rate should have been considered and analyzed by the Commission along with all the evidence regarding proper rate of return, including the testimony of Mr. O'Donnell on behalf of CUCA that 10.55% was the appropriate return on equity. The only other evidence supporting the 11.4% rate was the rebuttal testimony of Mr. Lurie in defense of the stipulation that the stipulated rate was "just

and reasonable." In light of the facts that Mr. Lurie's initial recommendation was 13.34% and that no other evidence supported the 11.4% rate, it is clear that the Commission adopted wholesale, without analysis or deduction, the 11.4% rate from the partial stipulation, as opposed to considering it as one piece of evidence to be weighed in making an otherwise independent determination. Thus, the Commission failed to adduce "its own independent conclusion" as to the appropriate rate of return on equity, and this case must be remanded to the Commission for its further consideration and findings on rate of return on equity consistent with this opinion.

## B. Cost of Service

We now turn to the Commission's findings on cost of service and rate design. Examination of the Commission's order reveals the Commission failed to make sufficient findings regarding the Company's cost of service, and therefore the rate design, applicable to the Company's customer classes.

[6] Cost of service to the various customer classes is a material fact in the present case for two significant reasons. First, the utility company's cost of providing service to each of its customer classes is an integral part of the formula for determining the appropriate rates of return for each customer class as it pertains to the ordered rate design. Under section 62-133, determining the effective rate of return for a particular customer class of a gas utility involves a mathematical computation of several components. *State ex rel. Util. Comm'n v. Carolina Util. Customers Ass'n*, 323 N.C. 238, 244-45, 372 S.E.2d 692, 696. The three basic components that must be ascertained in making the computation are: (1) the total rate base applicable to each customer class; (2) the *cost of service* or operating expenses applicable to each customer class; and (3) the revenues collected from each customer class for the test period, adjusted for any subsequent increase in rates. *Id.* at 245, 372 S.E.2d at 696.

Second, cost of service must be examined in reviewing whether there is unjust discrimination in rate design. N.C.G.S. § 62-140 prohibits unreasonable or unjust discrimination among classes of customers. *State ex rel. Util. Comm'n v. Bird Oil Co.*, 302 N.C. 14, 22, 273 S.E.2d 232, 237 (1981). The statute reads in applicable part:

> (a) No public utility shall, as to rates or services, make or grant any unreasonable preference or advantage to any person or subject any person to any unreasonable prejudice or disadvan-

tage. No public utility shall establish or maintain any unreasonable difference as to rates or services either as between localities or as between classes of service.

N.C.G.S. § 62-140(a) (1989). The charging of different rates for services rendered does not *per se* violate this statute. *State ex rel. Util. Comm'n v. Nello L. Teer Co.*, 266 N.C. 366, 376, 146 S.E.2d 511, 518 (1966). However, classifications of customers and differences in rates must be based on reasonable differences in conditions, and the variance in charges must bear a reasonable proportion to the variance in conditions. *State ex rel. Util. Comm'n v. N.C. Textile Mfrs. Ass'n*, 59 N.C. App. 240, 255, 296 S.E.2d 487, 496 (1982), *rev'd on other grounds*, 309 N.C. 238, 306 S.E.2d 113 (1983). A number of conditions or factors should be considered in determining whether unreasonable discrimination exists, including: (1) quantity of use, (2) time of use, (3) manner of service, and (4) *costs of rendering the various services. State ex rel. Util. Comm'n v. Carolina Util. Customers Ass'n*, 323 N.C. 238, 245, 372 S.E.2d 692, 696. Any matter that presents a substantial difference as a ground for distinction between customers or the rates charged is a *material factor* in the determination of rates. *Nello L. Teer*, 266 N.C. at 376, 146 S.E.2d at 518.

In the present case, the Commission concluded the stipulated rate design in Schedule II of the stipulation was just and reasonable and did not subject any customer class to discrimination or "rate shock." This was based on the following findings of fact regarding cost of service and the proposed stipulated rates:

35. Pennsylvania & Southern and CUCA presented the results of cost-of-service studies under both the filed and stipulated rates.

36. The major difference[s] between the cost-of-service studies prepared by Pennsylvania & Southern and CUCA were (1) the allocation of fixed gas costs to the various customer classes and (2) the characterization of firm service fees and sales differential charges as pipeline capacity charges or gas supply costs.

37. CUCA advocated the adoption of and utilized a 100 percent peak day allocation method in its cost-of-service study and treated firm service fees and sales differential charges as pipeline capacity charges. Using its cost-of-service methodology, CUCA calculated the following rates of return for Pennsylvania & Southern's various customer classes under the stipulated proposed rates:

| Rate Schedule | Return on Stipulated Rates |
|---|---|
| 101 Residential | 1.10% |
| 102 Small General | 16.54% |
| 104 Large General | 24.25% |
| 105 Interruptible | 38.98% |

38. Pennsylvania & Southern utilized the Seaboard Method for allocation purposes in its cost-of-service studies attributing 50 percent of fixed gas costs on a peak day basis and 50 percent of fixed gas costs on an average annual sales basis. Pennsylvania & Southern also treated firm service fees and sales differential charges as gas supply costs. Using its cost-of-service methodology, Pennsylvania & Southern calculated the following rates of return for its various customer classes under the stipulated proposed rates:

| Rate Schedule | Return on Stipulated Rates |
|---|---|
| 101 Residential | 3.68% |
| 102 Small General | 23.67% |
| 104 Large General | 18.12% |
| 105 Interruptible | 19.02% |

39. Estimated cost-of-service studies are subjective and judgmental, and while they can provide useful information in the rate design process, they should not be relied upon as the exclusive measure in setting rates. Instead, they should be analyzed in conjunction with other appropriate factors in determining proper rate design. These other appropriate factors include the value of the service to the customer, the type and priority of the service received by the customer, the frequency of interruptions of interruptible service, the quantity of use, the time of use, the manner of service, the competitive conditions related to both the retention of sales to and transportation for existing customers and the acquisition of new customers, the historic rate design and differentials between the various classes of customers, the revenue stability of the utility, and economic and political factors including the encouragement of expansion.

40. It is not appropriate to set rates in this proceeding based solely on any one or more of the estimated cost-of-service studies presented by CUCA and Pennsylvania & Southern.

41. In general, the cost-of-service studies presented in this proceeding show that somewhat higher rates of return exist

under the filed and stipulated proposed rates for Large General and Interruptible customers than for Residential customers and that the rate of return on Residential customers is below the total Company returns.

42. CUCA advocates moving to essentially equalized rates of return where the difference in rates of return between Residential and Interruptible customers would be no more than 2.5 percent.

43. Rates to Industrial customers have decreased in the last three Pennsylvania & Southern general rate cases. Rates to Residential customers have historically risen. Pennsylvania & Southern and the Public Staff have agreed to further the trend of greater increases in Residential rates in this general rate case as follows:

| Rate Schedule | % Increase from Existing Rates |
| --- | --- |
| 101 Residential | 6.21% |
| 102 Small General | 0.98% |
| 104 Large General | 0.50% |
| 105 Interruptible | 0.00% |

44. Pennsylvania & Southern's residential customers, unlike its large commercial and industrial customers, have very little ability to switch to alternate fuels without major expense. Pennsylvania & Southern's residential customers also do not have the ability to negotiate lower rates as do industrial customers and, in fact, bear the risk of being required to make up margin losses from negotiated rates. These factors, among others, justify higher rates of return from Large General and Interruptible customers and lower rates of return from residential customers.

45. Rates based solely on equalized rates of return among customer classes are not reasonable for purposes of this proceeding.

46. The proposed rates set forth on Schedule II of the Stipulation are just and reasonable for purposes of this proceeding and do not subject any customer or class of customers to rate shock or unjust or discriminatory rates.

[7] These findings by the Commission with regard to cost of service, while extensive in reciting what the parties have done in this respect,

nevertheless lack analysis and are thus insufficient to enable this Court to properly review the ordered rate design. The findings are inadequate in several respects. First, the only determination made regarding the cost of service calculation, despite acknowledging substantial evidentiary presentation and differing opinions by the opposing witnesses, was Finding of Fact No. 41: "In general, the cost-of-service studies presented in this proceeding show that somewhat higher rates of return exist under the filed and stipulated proposed rates for Large General and Interruptible customers than for Residential customers and that the rate of return on Residential customers is below the total Company returns." This blanket statement alone fails to provide any independent comparative thought, analysis or weighing process on the part of the Commission itself in measuring the disputed positions of the parties and determining what it considers to be a fair allocation of costs between the various customer classes and thus a fair and nondiscriminatory rate design. It also fails to identify the method the Commission used for analyzing the cost-of-service differentials and their impact on the ultimate rate-of-return issue. Second, the findings do not establish the magnitude of the differences among the rates of return provided by the various customer classes. As a result, this Court is prevented from reviewing the manner in which the Commission considered cost-related versus non-cost-related factors in adopting the stipulated rate design. Third, the findings do not set forth the existing rate differences with respect to the cost of serving the several customer classes. This prevents the Court from analyzing the factual basis of the Commission's conclusion that no customer or class of customers will suffer from "rate shock or unjust or discriminatory rates." Finally, the Commission's characterization of industrial class rates as "somewhat higher" under the stipulated rates is not only vague, but arguably contrary to the evidence. Even under the Company's more conservative calculation method, rates for rate schedules 102, 104 and 105 are approximately six to seven times higher than for residential customers in schedule 101.

In *State ex rel. Util. Comm'n v. N.C. Textile Mfrs. Ass'n*, 313 N.C. 215, 328 S.E.2d 264 (1985), this Court addressed a similar situation as follows:

> In light of the substantial difference between cost of service and rate of return for the various classes of customers, the question of unreasonable discrimination among and within the classes of service is a material issue of fact and law. The

Commission's failure to [adequately] address this issue in its findings of fact is error prejudicing the substantial rights of defendants.

*Id.* at 223, 328 S.E.2d at 269. In the case *sub judice*, the Commission's insufficient findings regarding cost of service undermine its formulation of the rate of return under section 62-133 and its ultimate adoption of the stipulated rate design. Accordingly, this case must be remanded to the Commission for its further consideration of this issue and appropriate findings not inconsistent with this opinion.

## II. "Full Margin" Transportation Rates

[8] CUCA also assigns error to the Commission's approval of the Company's use of full margin transportation rates. CUCA contends that full margin rates are improper and unlawful due to their inclusion of certain fixed gas costs which, CUCA argues, are not related to the provision of transportation services. CUCA maintains that transportation rates should be based on cost of service alone. We disagree.

An examination of prior case law reveals this Court has addressed the lawfulness of full margin rates several times and has consistently affirmed the Commission's approval of such rates. *State ex rel. Util. Comm'n v. Carolina Util. Customers Ass'n [CUCA]*, 328 N.C. 37, 399 S.E.2d 98 (1991); *State ex rel. Util. Comm'n v. Carolina Util. Customers Ass'n [CUCA]*, 323 N.C. 238, 372 S.E.2d 692; *State ex rel. Util. Comm'n v. N.C. Textile Mfrs. Ass'n*, 313 N.C. 215, 328 S.E.2d 264. While CUCA is correct in its assertion that "the final order of the Commission [in a general rate case] is not within the doctrine of *stare decisis*," *State ex rel. Util. Comm'n v. Carolina Power & Light Co.*, 250 N.C. 421, 430, 109 S.E.2d 253, 260 (1959); *accord State ex rel. Util. Comm'n v. Thornburg*, 325 N.C. 463, 468-69, 385 S.E.2d 451, 454 (1989), prior decisions of this Court regarding general questions of law and the principles underlying those decisions serve to guide the Court's decisions in individual cases.

In *Textile Mfrs.*, 313 N.C. 215, 328 S.E.2d 264, this Court stated: "We do not hold that it is unjust and unreasonable as a matter of law for a utility to earn the same profit margin on transported gas that it earns on its own retail sales of gas." *Id.* at 225, 328 S.E.2d at 270. This principle was reiterated in *Utilities Comm'n v. CUCA*, 323 N.C. 238, 372 S.E.2d 692, where we stated, "on this record it was not unlawful to permit the transportation rates to have the same margins as the sales rates." *Id.* at 254, 372 S.E.2d at 701. Finally, in *Utilities Comm'n*

*v. CUCA*, 328 N.C. 37, 399 S.E.2d 98, we stated, "Both the Commission and this Court have consistently rejected the notion that cost of service should be the sole factor in determining rates or rate designs, whether the rates are for the sale of gas or the transportation of gas." *Id.* at 46, 399 S.E.2d at 103. We decline to overrule these decisions and continue to hold full margin transportation rates proper as a matter of law so long as they are supported by competent, material and substantial evidence in view of the entire record, pursuant to the standard of appellate review codified in N.C.G.S. § 62-94.

Examination of the case *sub judice* reveals substantial evidence to support the Commission's approval of the Company's full margin transportation rates. In its order, the Commission made the following findings of fact regarding full margin transportation rates:

> 47. The Commission has approved the use of full margin transportation rates for all of the LDCs [local distribution companies] in North Carolina.

> 48. The underlying premise of full margin transportation rates is that transportation rates should not provide an incentive or disincentive for an LDC to transport gas rather than sell gas under its filed tariff rate. In order for an LDC to be neutral on this issue, transportation customers must pay the same fixed costs they would pay as sales customers.

The Commission enunciated its reasons for these findings in its section "Evidence and Conclusions for Findings of Fact Nos. 47-48":

> The Company proposes to continue its use of full margin transportation rates. CUCA witness O'Donnell testified that such rates were unfair because they forced transportation customers to pay a portion of the Company's fixed gas costs. Company witness Carl testified that pipeline capacity costs incurred by the Company support not only peak deliverability but also seasonal and annual deliverability and storage injections as well.

> The Commission has addressed the issue of full margin transportation rates on many prior occasions, and has approved the use of such rates for each of the LDCs now operating in the State. The Commission continues to believe that such rates are reasonable and appropriate for purposes of this docket.

The record also reveals Company witness Carl testified that the ability of certain customers to switch from transportation to sales rates

when necessary or expedient necessitated the Company's inclusion of fixed gas costs in its rates to meet such contingencies without costs shifting to customers who do not possess such flexibility. Moreover, Company witness Carl undermined CUCA's assertion that full margin rates exceed cost of service by testifying to the difficulty, if not impossibility, of extracting costs from the full margin rate so as to isolate only "transportation" services. This record evidence, combined with the Commission's analysis of prior cases addressing the legality of full margin rates, is more than adequate to support the Commission's approval of the Company's full margin transportation rates. This portion of the Commission's order is affirmed.

Accordingly, while we affirm the Commission's determination as to full margin transportation rates, we must reverse with respect to its conclusion on rate of return and cost of service and remand for the Commission's further determination not inconsistent with this opinion. The order of the Commission is

REVERSED AND REMANDED.