IN THE SUPREME COURT OF NORTH CAROLINA

No. 347A14

(Filed 21 August 2015)

STATE OF NORTH CAROLINA ex rel. UTILITIES COMMISSION; AQUA NORTH CAROLINA, INC., Applicant; and PUBLIC STAFF – NORTH CAROLINA UTILITIES COMMISSION, Intervenor

v.

ATTORNEY GENERAL ROY COOPER, Intervenor

On direct appeal as of right pursuant to N.C.G.S. §§ 7A-29(b) and 62-90(d) from a final order of the North Carolina Utilities Commission entered on 2 May 2014 in Docket No. W-218, Sub 363. Heard in the Supreme Court on 16 March 2015.

*Sanford Law Office, PLLC, by Jo Anne Sanford; Bennink Law Office, by Robert H. Bennink, Jr.; Law Office of Charlotte Mitchell, by Charlotte Mitchell; and Allegra Collins Law, by Allegra Collins, for applicant-appellee Aqua North Carolina, Inc.*

*Antoinette R. Wike, Chief Counsel, and William E. Grantmyre, Staff Attorney, for intervenor-appellee Public Staff – North Carolina Utilities Commission.*

*Stuart Saunders, Assistant Attorney General, Kevin Anderson, Senior Deputy Attorney General, and Jennifer T. Harrod, Special Deputy Attorney General, for intervenor-appellant Roy Cooper, Attorney General.*

JACKSON, Justice.

In this case we consider whether the North Carolina Utilities Commission (the Commission) properly concluded that it is in the public interest to allow Aqua North Carolina (Aqua) to utilize a rate adjustment mechanism of the type described in section 62-133.12 of the North Carolina General Statutes. We conclude that the

Commission's determination was based upon sufficient findings of fact and was supported by competent, material, and substantial evidence in view of the entire record. *See* N.C.G.S. § 62-94 (2013). Accordingly, we affirm.

Aqua is a public utility that provides water and sewer utility service to customers in North Carolina. On 2 August 2013, Aqua filed an application with the Commission seeking authority to increase its rates for water and sewer service in North Carolina. As part of its application, Aqua also requested authority to implement a rate adjustment mechanism pursuant to section 62-133.12, which states in pertinent part:

> The Commission may approve a rate adjustment mechanism in a general rate proceeding . . . to allow a water or sewer public utility to recover through a system improvement charge the incremental depreciation expense and capital costs associated with the utility's reasonable and prudently incurred investment in eligible water and sewer system improvements. The Commission shall approve a rate adjustment mechanism authorized by this section only upon a finding that the mechanism is in the public interest. The frequency and manner of rate adjustments under the mechanism shall be as prescribed by the Commission.

*Id.* § 62-133.12(a) (2013).

On 19 August 2013, the Commission entered an order declaring this proceeding to be a general rate case and suspending the proposed new rates for up to 270 days. The Commission scheduled six hearings across the state to receive public witness testimony. The Commission also scheduled an evidentiary hearing for 27

January 2014. The Attorney General of North Carolina and the Public Staff of the Commission intervened as allowed by law. *See id.* §§ 62-15, -20 (2013).

Subsequently, Aqua and the Public Staff entered into a Stipulation that resolved all the issues in the case between the two parties. At the time, the Commission had not adopted final rules establishing the appropriate procedures for implementing a rate adjustment mechanism. Nevertheless, the Stipulating Parties agreed that "this docket is the appropriate forum for a decision by the Commission on [Aqua's] request to implement a [rate adjustment] mechanism based on a finding that the [mechanism] is in the public interest." The Attorney General did not join in the Stipulation.

During the hearings before the Commission, fifty-four Aqua customers testified, and the parties presented testimony from several witnesses. Thirty customers expressed service-related concerns, which primarily focused on problems with water quality, such as receiving water that appeared discolored, contained sediment, caused damage to appliances, and stained laundry items. Customers also raised other concerns, including billing issues, low water pressure, and sulfur or chlorine odors. Customers "almost unanimously" opposed any rate increase.

At the evidentiary hearing, Aqua offered evidence supporting the conclusion that use of a rate adjustment mechanism is in the public interest. Aqua's President and Chief Operating Officer, Thomas J. Roberts, asserted that the mechanism would

allow Aqua to adjust its rates to recover money invested in "necessary, reasonable, approved and completed projects," with the cumulative rate adjustment limited to five percent of the total annual service revenues approved by the Commission in the current general rate case. Roberts stated that, as a result of these rate adjustments, Aqua would be able to fund "earlier and more robust investment in infrastructure" and recover its investments "on a more timely basis." In addition, Roberts noted that the mechanism would allow for "incremental adjustments" to rates, "rather than the sharp rate changes that are characteristic of general rate cases."

Roberts acknowledged that some customers have difficulties with discolored, sediment-laden water, and he stated that these problems are caused by naturally occurring iron and manganese present in ground water. Roberts testified that, although many customers do not find such water acceptable, it complies with environmental regulations and does not create any health risks. Roberts asserted that Aqua could employ a number of methods to improve water quality, and he stated that use of a rate adjustment mechanism would provide funding "to accelerate the investment needed to address these concerns."

In addition to discussing customers' concerns about water quality, Roberts stated that other aspects of Aqua's system need improvements. Roberts testified that an internal analysis had revealed that portions of Aqua's water main infrastructure are seriously outdated and need replacement. Roberts also stated that Aqua needs

to fund replacement of motors, pumps, and other equipment, as well as implement measures to improve how the system copes with significant rain events. Ultimately, Roberts asserted that use of a rate adjustment mechanism would facilitate improvements to infrastructure and result in "fewer water quality related complaints, enhanced water pressure, and decreased main breaks."

Aqua witness Robert A. Kopas, Regional Controller for Aqua Ohio, Inc., provides financial supervision and guidance to Aqua North Carolina. He testified that Aqua had presented to the Commission a "three-year plan" listing possible future projects that could be eligible for recovery through a rate adjustment mechanism. Kopas explained that Aqua did not submit this document to seek Commission approval of any of the specific projects listed; instead, it was submitted to support the company's contention that use of a rate adjustment mechanism is in the public interest. Kopas asserted that before Aqua could recover any money through the mechanism, the company would have to construct an eligible improvement, place the improvement into service, and propose the improvement for inclusion in a rate adjustment, after which the Commission and the Public Staff would determine the project's eligibility and the reasonableness of the associated costs.

Aqua witness Pauline M. Ahern, a principal with AUS Consultants, testified that a rate adjustment mechanism would partially mitigate regulatory lag, "which occurs during the time between the incurrence of a utility capital expenditure or

expense and the time when the utility can begin to earn a return on . . . the capital investment or recovery of the expense incurred." Ahern stated that the mechanism "will improve the capital attractiveness of [Aqua], improve its service quality and reliability, and provide for more moderate, gradual rate increases."

The Public Staff presented testimony from David C. Furr, Director of the Public Staff's Water and Sewer Division. Furr testified that he had reviewed the three-year plan filed by Aqua in order to evaluate whether the listed projects might be eligible for recovery through a rate adjustment mechanism. Furr stated that Aqua's three-year plan did not contain enough detail for him to determine whether the projects would be eligible, and although the Public Staff had requested additional information, Aqua's response remained "materially inadequate." In contrast, Roberts testified that Aqua believed it had provided sufficient detail and that the company was "willing to give all the detail that the Public Staff and the Commission would want."

The Commission entered an order in Aqua's general rate case on 2 May 2014. The Commission noted that the water quality concerns raised by some Aqua customers were related to high concentrations of naturally occurring iron and manganese in the source supply of water. The Commission found that iron and manganese are "subjects of Department of Environment and Natural Resources (DENR) secondary – not primary – water quality standards, and thus do not

represent health issues." Nevertheless, the Commission concluded that "[a]dditional attention is required to address the issues which arise from elevated levels of naturally occurring iron and manganese in the source water supply in certain Aqua systems."

In addition, the Commission found that enactment of section 62-133.12 "was intended to encourage and accelerate investment in needed water and sewer infrastructure" by "alleviat[ing] the effects of regulatory lag by allowing for earlier recovery of some portion" of "depreciation expense and capital costs." The Commission determined that if a rate adjustment mechanism were authorized here, "Aqua would be incentivized and encouraged to accelerate its investment in water and sewer infrastructure improvements to comply with applicable water quality and effluent standards, including secondary water quality standards." Specifically, the Commission explained that the mechanism "will be available to fund projects to address problematic systemic secondary water quality issues should the Commission direct [Aqua] to undertake them in individual subdivision service areas." The Commission found that such additional investment in infrastructure would lead to "better water quality" and "improved system reliability." As a result, the Commission found that Aqua's request to implement a rate adjustment mechanism is in the public interest and therefore approved the company's request.

At the same time, the Commission ordered Aqua and the Public Staff "to develop and implement a plan to identify and respond to [significant] secondary water quality concerns" in particular service areas. The Commission required Aqua and the Public Staff, "[a]t a minimum," to file written reports on the first of June and the first of December every year while the rate adjustment mechanism is in effect. These written reports must describe any secondary water quality concerns affecting Aqua's customers. If a particular concern affects at least ten percent of the customers in an individual subdivision or at least twenty-five billing customers, additional information must be provided. In such cases the reports must recommend whether Aqua should be required to undertake corrective action with respect to specific water quality concerns.

The Commission noted that final rules implementing the rate adjustment mechanism had not been approved. The Commission concluded that it should adopt alternative procedures, which were set forth in appendices to its order, to enable Aqua to make the requisite filings and qualify for implementation of charges pursuant to the rate adjustment mechanism without having to file an additional general rate case application once final rules were adopted. The Attorney General appealed the Commission's order to this Court as of right pursuant to N.C.G.S. §§ 7A-29(b) and 62-90.

Subsection 62-79(a) of the North Carolina General Statutes "sets forth the standard for Commission orders against which they will be analyzed upon appeal." *State ex rel. Utils. Comm'n v. Carolina Util. Customers Ass'n* (*CUCA I*), 348 N.C. 452, 461, 500 S.E.2d 693, 700 (1998). Subsection 62-79(a) provides:

> (a) All final orders and decisions of the Commission shall be sufficient in detail to enable the court on appeal to determine the controverted questions presented in the proceedings and shall include:
>
> > (1) Findings and conclusions and the reasons or bases therefor upon all the material issues of fact, law, or discretion presented in the record, and
> >
> > (2) The appropriate rule, order, sanction, relief or statement of denial thereof.

N.C.G.S. § 62-79(a) (2013). When reviewing an order of the Commission, this Court may, *inter alia,*

> reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:
>
> > (1) In violation of constitutional provisions, or
> >
> > (2) In excess of statutory authority or jurisdiction of the Commission, or
> >
> > (3) Made upon unlawful proceedings, or
> >
> > (4) Affected by other errors of law, or
> >
> > (5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or

(6) Arbitrary or capricious.

*Id.* § 62-94(b). Pursuant to subsection 62-94(b) this Court must determine "whether the Commission's findings of fact are supported by competent, material and substantial evidence in view of the entire record." *CUCA I*, 348 N.C. at 460, 500 S.E.2d at 699 (citation omitted). "Substantial evidence [is] defined as 'more than a scintilla or a permissible inference.' " *Id.* at 460, 500 S.E.2d at 700 (alteration in original) (quoting *State ex rel. Utils. Comm'n v. S. Coach Co.*, 19 N.C. App. 597, 601, 199 S.E.2d 731, 733 (1973), *cert. denied*, 284 N.C. 623, 201 S.E.2d 693 (1974)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126, 140 (1938)). The Commission must include all necessary findings of fact, and failure to do so constitutes an error of law. *Id.* (citation omitted).

The Attorney General argues that the Commission's finding that Aqua's request to use a rate adjustment mechanism is in the public interest is not based upon sufficient findings, reasoning, and conclusions, and is not supported by substantial evidence. In addition, the Attorney General contends both that the Commission had no proper basis for this finding and that the Commission's conclusion that the mechanism would incentivize Aqua to invest in infrastructure

and improve its service quality "is, at most, speculative" because the order did not impose any "concrete obligation, commitment, or anything else." We disagree.

"The Utilities Commission, not this Court, is the finder of fact in this proceeding. Findings of fact made by the Commission are prima facie just and reasonable on appeal." *State ex rel. Utils. Comm'n v. Eddleman*, 320 N.C. 344, 382-83, 358 S.E.2d 339, 363 (1987) (citations omitted). "[T]he Commission's findings, if supported by competent, material, and substantial evidence in view of the record as a whole, are binding upon this Court." *State ex rel. Utils. Comm'n v. Pub. Staff*, 317 N.C. 26, 45, 343 S.E.2d 898, 910 (1986) (citing *State ex rel. Utils. Comm'n v. Carolina Tel. & Tel. Co.*, 267 N.C. 257, 148 S.E.2d 100 (1966)). As a result, if there is substantial evidence to support the Commission's determination, this Court will not substitute its judgment for that of the Commission. *Id.* at 46-47, 343 S.E.2d at 910-11.

By enacting section 62-133.12, the General Assembly authorized the use of a rate adjustment mechanism upon a "finding" by the Commission "that the mechanism is in the public interest." N.C.G.S. § 62-133.12(a). As previously stated, the Commission found that allowing Aqua to use a rate adjustment mechanism is in the public interest. In making this determination, the Commission initially found that the legislative intent behind section 62-133.12 was to provide a mechanism to

incentivize quicker investments in water and sewer infrastructure by allowing for faster recovery of some portion of invested costs.

The Commission explained that, because of the time involved in preparing and processing general rate cases, the long periods of construction required for major projects, and the Commission's use of historical test years in setting rates, a regulatory lag period occurs between when a utility invests in improvements and when it begins to recover the capital costs of those improvements. The Commission noted that Roberts had testified that implementing a rate adjustment mechanism would allow Aqua to recover invested funds more quickly and therefore enable Aqua to invest more capital in this state. Similarly, the Commission observed that Ahern had testified that use of the mechanism would result in "[p]artial mitigation of [regulatory] lag" and lead to water quality improvements that otherwise would be delayed. After considering their testimony and the arguments raised by the Attorney General, the Commission concluded that implementing the mechanism "will promote adequate, reliable, and economical utility service for Aqua's customers" by "incentiviz[ing] Aqua to increase and accelerate infrastructure improvements." These findings are supported by the testimony of Roberts and Ahern.

The Commission discussed the "secondary water quality issues" raised by Aqua's customers and found that, as stated by Roberts, these problems result from high concentrations of iron and manganese found naturally in sources of groundwater

within Aqua's system. The Commission determined that in the past, water utilities may have given lower priority to correcting secondary water quality issues because these companies first spend their limited budgets on primary water quality improvements. The Commission found that use of a rate adjustment mechanism would benefit customers further because accelerated funding will be available for projects undertaken at the Commission's direction to improve secondary water quality. The Commission then ordered Aqua and the Public Staff to file written reports addressing secondary water quality concerns twice each year while the mechanism is in effect and required that these filings detail particular water quality problems and make recommendations on whether Aqua should be ordered to pursue corrective action. Rather than solely relying upon a commitment by Aqua or the Public Staff, the Commission affirmatively imposed obligations to ensure that Aqua would use the rate adjustment mechanism only to make meaningful improvements to its system.

The Commission further noted that pursuant to the alternative procedures it had adopted in its order, approval of the mechanism would not result in automatic surcharges for customers. The Commission explained that these procedures require Aqua to obtain Commission approval for any additional charges, and the approval process will involve review by the Public Staff and the Commission to determine whether Aqua's investments and costs are reasonable and prudent. Furthermore, the Commission explained that Aqua could use the mechanism to recover only those

costs that are invested in "eligible system improvements" that are "completed and placed in service prior to the Company requesting approval."

The Commission acknowledged that witness Furr had testified that Aqua's initial three-year plan was "materially deficient," but noted that Roberts had testified that Aqua "is willing to provide all information required by the Public Staff." In addition, the Commission found that, because this case involves a new process, "one party . . . may believe the level of detail provided is sufficient; whereas, another party may not." The Commission also directed Aqua to provide enough information to allow the Public Staff to "conduct its investigation and review of [Aqua's] initial three-year plan," "have productive discussions with [Aqua] regarding the specific projects included in the plan," and "conclude whether the projects included in [the] three-year plan meet the criteria established in [section] 62-133.12" to "be considered for recovery through the [rate adjustment] mechanism."

Ultimately, the Commission found that

> Aqua would be incentivized and encouraged to accelerate its investment in water and sewer infrastructure improvements to comply with applicable water quality and effluent standards, including secondary water quality standards, if authorized to utilize a [rate adjustment] mechanism to recover some of its investment in a more timely manner and alleviate the effects of regulatory lag. Such accelerated investment to address aging infrastructure and water quality issues would benefit customers through improved system reliability and better water quality. The [rate adjustment] mechanism would further benefit customers because it will be available to

> fund projects to address problematic systemic secondary water quality issues should the Commission direct the Company to undertake them in individual subdivision service areas, even though such projects may not be specifically required by federal and/or state standards and might not be of high system priority absent the direction of the Commission. The [rate adjustment] mechanism does not affect or take away the Commission's authority to disallow recovery for projects and investments found to be unreasonable and imprudent.

The Commission thoroughly explained how Aqua's use of a rate adjustment mechanism would benefit Aqua's customers, and the Commission took meaningful steps to ensure that problems with water quality are addressed and that customers are charged only after Aqua has made improvements to the quality and reliability of its service. We hold that the Commission provided sufficient findings, reasoning, and conclusions to support its ultimate finding that the mechanism is in the public interest, and that the Commission's determination is supported by substantial evidence in view of the record as a whole. Accordingly, the Commission's order is affirmed.

AFFIRMED.