IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-760

Filed 17 September 2024

North Carolina Utilities Commission, No. E-100, SUB 180

STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION; PUBLIC STAFF - NORTH CAROLINA UTILITIES COMMISSION, Intervenor; DUKE ENERGY PROGRESS, LLC, Petitioner; DUKE ENERGY CAROLINAS, LLC, Petitioner,

v.

ENVIRONMENTAL WORKING GROUP, Intervenor; 350 TRIANGLE, Intervenor; 350 CHARLOTTE, Intervenor; THE NORTH CAROLINA ALLIANCE TO PROTECT OUR PEOPLE AND THE PLACES WE LIVE, Intervenor; NC WARN, Intervenor; NORTH CAROLINA CLIMATE SOLUTIONS COALITION, Intervenor; SUNRISE MOVEMENT DURHAM HUB, Intervenor; DONALD E. OULMAN, Intervenor.

Appeal by Intervenors-appellants from order entered 23 March 2023 by the North Carolina Utilities Commission. Heard in the Court of Appeals 7 February 2024.

*Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, by Jack E. Jirak, Marion "Will" Middleton, III, Catherine Wrenn, and J. Ashley Cooper, pro hac vice, for petitioners-appellees Duke Energy Carolinas, LLC, and Duke Energy Progress, LLC.*

*Chief Counsel Lucy E. Edmondson and Anne M. Keyworth, Staff Attorney, for intervenor-appellee Public Staff – North Carolina Utiltities Commission.*

*Lewis & Roberts, PLLC, by Matthew D. Quinn, for intervenors-appellants NC WARN, North Carolina Climate Solutions Coalition, and Sunrise Movement Durham Hub.*

*Catherine Cralle Jones and Caroline Leary, pro hac vice, for intervenor-appellant Environmental Working Group.*

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

*Andrea C. Bonvecchio for intervenors-appellants 350 Triangle, 350 Charlotte, and the North Carolina Alliance to Protect Our People and the Places We Live.*

*Donald E. Oulman, pro se, as intervenor-appellant.*

MURPHY, Judge.

N.C.G.S. § 62-126.4 requires the electric public utility Companies to file proposed revised NEM tariffs for the Utilities Commission's approval. The plain language of the statute provides that, before the Commission may establish net metering rates, it must conduct an investigation of the costs and benefits of customer-sited generation. The plain statutory language further directs that—only after the Commission has fulfilled this statutory duty—the Commission shall establish nondiscriminatory net metering rates that ensure the NEM customer pays its full fixed cost of service under all offered NEM tariff designs. The Commission erred in concluding that it was not required to perform an investigation of the costs and benefits of customer-sited generation; however, the record reveals that the Commission de facto performed such an investigation when it opened an investigation docket in response to the Companies' proposed revised NEM rates; permitted all interested parties to intervene; and accepted, compiled, and reviewed over 1,000 pages of evidence.

The Commission is delegated exclusive authority to establish NEM rates, and we do not disturb an order by the Commission approving NEM rates unless we

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

determine it to be unconstitutional, in excess of the Commission's statutory authority or jurisdiction, procedurally unlawful, legally erroneous, unsupported by the evidence, or arbitrary or capricious and prejudicial to an appellant's substantial rights. The Commission made findings of fact as to the costs and benefits of customer-sited generation supported by competent, material, and substantial evidence; reached conclusions of law supported by these findings of fact; and acted pursuant to its explicit statutory authority under N.C.G.S. § 62-126.4. We uphold the Commission's order establishing the Companies' revised NEM rates as modified by this opinion to reflect that N.C.G.S. § 62-126.4 requires the Commission to perform an investigation of the costs and benefits of customer-sited generation before it may establish NEM rates.

## BACKGROUND

Environmental Working Group, 350 Triangle, 350 Charlotte, the North Carolina Alliance to Protect Our People and the Places We Live, NC WARN, North Carolina Climate Solutions Coalition, Sunrise Movement Durham Hub, and Donald E. Oulman (collectively, "Appellants") appeal from the *Order Approving Revised Net Metering Tariffs* entered by the North Carolina Utilities Commission ("Commission") on 23 March 2023, which established new rates for net energy metering ("NEM") customers served by Appellees Duke Energy Progress, LLC, and Duke Energy Carolinas, LLC (collectively, "the Companies").

### A. History of NEM

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

The Commission first approved NEM rates for pilot photovoltaic ("PV") rate riders in 2000. These pilot riders allowed customers with small-scale PV generating facilities "to operate their facilities in parallel with the utility, to use the generation from the PV facility to offset some or all of the electricity that would otherwise be supplied to them by the utility, and to receive a credit for any excess generation provided to the utility."

In October 2005, the Commission established an initial framework for NEM in North Carolina, defined "as a billing arrangement whereby the customer-generator is billed according to the difference over a billing period between the amount of energy consumed by the customer at its premises and the amount of energy generated by the renewable energy facility." This framework included a mandatory "time-of-use" ("TOU") rate schedule, with compensation rates for excess customer generation to be "commensurate with the TOU period" during which excess energy was generated, and eliminated all types of stand-by charges for participating customers.

In July 2006, the Commission ordered "utilities to amend their NEM tariffs and riders to allow for any residual excess on-peak energy not consumed by the participating customer during on-peak periods to be applied against any remaining off-peak consumption during a monthly billing period[]" and "maintained its position[s] that the TOU-demand rate schedule requirement for NEM was not too complicated" and "that renewable energy certificates ([']RECs[']) associated with excess energy would be transferred to the utility to help offset the costs otherwise

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

borne by the utility and ratepayers in general that were incurred to accommodate NEM."

In August 2007, our General Assembly enacted the Clean Energy and Energy Efficiency Portfolio Standard ("CEPS"). *See* N.C.G.S. § 62-133.8 (2023). In response, the Commission amended NEM policy to require

> utilities to offer customer-generators the option of NEM under any rate schedule available to customers in the same rate class but allow[] customers on the TOU-demand tariff to retain all the RECs associated with the customer's generation while allowing the utility to obtain the RECs from NEM customers on all other retail rate schedules at no cost as part of the NEM arrangement. The Commission further determined that NEM customers on any TOU rate schedule must have on-peak generation first applied to offset on-peak consumption and excess off-peak generation first applied to offset off-peak consumption.

The Commission acknowledged potential concerns of cross-subsidization under this framework "but decided that such potential was outweighed by the potential for non-quantified benefits and the clearly enunciated State policy favoring development of additional renewable generation."

In 2017, the General Assembly enacted the Distributed Resources Access Act, N.C.G.S. §§ 62-126.1 through 62-126.10, which declared

> as a matter of public policy it is in the interest of the State to encourage the leasing of solar energy facilities for retail customers and subscription to shared community solar energy facilities. The General Assembly further finds and declares that in encouraging the leasing of and subscription to solar energy facilities pursuant to this act, cross-subsidization should be avoided by holding harmless

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

electric public utilities' customers that do not participate in such arrangements.

N.C.G.S. § 62-126.2 (2023). The Act also required the Commission to establish NEM rates according to the following procedure:

(a) Each electric public utility shall file for Commission approval revised net metering rates for electric customers that (i) own a renewable energy facility for that person's own primary use or (ii) are customer generator lessees.

(b) The rates shall be nondiscriminatory and established only after an investigation of the costs and benefits of customer-sited generation. The Commission shall establish net metering rates under all tariff designs that ensure that the net metering retail customer pays its full fixed cost of service. Such rates may include fixed monthly energy and demand charges.

(c) Until the rates have been approved by the Commission as required by this section, the rate shall be the applicable net metering rate in place at the time the facility interconnects. Retail customers that own and install an on-site renewable energy facility and interconnect to the grid prior to the date the Commission approves new metering rates may elect to continue net metering under the net metering rate in effect at the time of interconnection until [1 January] 2027.

N.C.G.S. § 62-126.4 (2023).

In 2021, the General Assembly enacted House Bill 951, which created specific goals for reduced carbon emissions from electric generating facilities, instructed the Commission to create a "Carbon Plan" to achieve these goals, and directed the Commission to

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

> (i) evaluate and modify as necessary existing standby service charges, (ii) revise net metering rates, (iii) establish an on-utility-bill repayment program related to energy efficiency investments, and (iv) establish a rider for a voluntary program that will allow industrial, commercial, and residential customers who elect to purchase from the electric public utility renewable energy or renewable energy credits, including in any program in which the identified resources are owned by the utility in accordance with sub-subdivision b. of subdivision (2) of Section 1 of this act, to offset their energy consumption, which shall ensure that customers who voluntarily elect to purchase renewable energy or renewable energy credits through such programs bear the full direct and indirect cost of those purchases, and that customers that do not participate in such arrangements are held harmless, and neither advantaged nor disadvantaged, from the impacts of the renewable energy procured on behalf of the program customer, and no cross-subsidization occurs.

2021 North Carolina Laws S.L. 2021-165 § 5 (H.B. 951).

## B. Procedural History

On 29 November 2021, the Companies filed a joint petition for approval of revised NEM rates with the Commission pursuant to N.C.G.S. § 62-126.4. In their petition, the Companies stated that the proposed revised rates were chosen based on their own recently-conducted "Comprehensive Rate Design Study," which the Companies alleged fulfilled the statutory requirement that revised "rates shall be . . . established only after an investigation of the costs and benefits of customer-sited generation." N.C.G.S. § 62-126.4 (2023). Specifically, the Companies claimed that

> the results of the Rate Design Study provide a current and detailed look at the costs and benefits of serving NEM customers under Existing NEM Programs. The Companies

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

> utilitized these results to create rate structures that accurately capture the current costs to serve these customers and ensure NEM customers pay their "full fixed cost of service" in accordance with [N.C.G.S. § 62-126.4].

Based on the Comprehensive Rate Design Study, the Companies' proposed rates would (1) establish a monthly minimum bill amount to ensure that energy distribution costs are properly recovered from the customers who created those costs; (2) create a grid access fee for customers with large solar facilities, as those customers "represent the greatest potential for under-recovery of fixed costs"; (3) create non-bypassable charges to recover costs not currently included in the Companies' energy rates to ensure that solar program expenses and non-energy linked costs are not inappropriately collected from non-solar customers, but from NEM customers; (4) credit customers "for any net monthly exports to the utility grid" at the same rates that the Companies pay to utility-scale qualifying facilities to "accurately capture the benefits provided to the total utility system by the customer-sited generation and [to] align the costs of serving these customers with the benefits [the Companies] receive[]" from these customers; and (5) utilize the Companies' established TOU rate schedule to "produce rates that are more reflective of the costs and help reduce cost shifts by incentivizing load to be shifted to low-cost times and ensuring cost recovery for higher cost peak periods[,]" "with any net excess energy exported to the grid from a customer-sited facility credited to the customer each month at avoided cost rates."

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

The Companies also presented the Commission with a Memorandum of Understanding ("MOU") amongst themselves and four solar energy interest groups, indicating the interest groups' support of the Companies' proposed NEM tariffs and of a resolution proposed in a separate docket to create incentives for residential customer-generators who took service under the new NEM rates. The MOU further "set[] out a non-binding understanding that [the Companies] would explore a solar program tailored to low-income customers as a potential future [energy efficiency] or demand response program[]" and "work collaboratively with stakeholders to develop a policy proposal for the next generation of nonresidential NEM."

On 10 January 2022, the Commission docketed the Companies' petition *In the Matter of Investigation of Proposed Net Metering Policy Changes* and directed all interested parties to file comments or petitions to intervene on or before 15 March 2022. The Commission recognized Appellees North Carolina Utilities Commission – Public Staff and the North Carolina Attorney General's Office as intervenors pursuant to N.C.G.S. §§ 62-15(d) and 62-20. The Commission also granted the petitions of Appellants to intervene in the docket. The Commission accepted comments, reply comments, and further responsive comments into the docket. The Commission established the final deadline for further responsive comments on 27 May 2022.

On 16 June 2022, several of the Appellants filed a joint motion for an evidentiary hearing. The Commission accepted parties' responses to the motion filed

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

on or before 24 June 2022 and, on 8 November 2022, denied the motion. The Commission further ordered that the parties file proposed orders and briefs. On 23 March 2023, the Commission entered an *Order Approving Revised Net Metering Tariffs*, which included slight alterations to the Companies' proposed tariffs. On 3 April 2023, the Companies filed the new NEM tariffs, to become effective on 1 July 2023. Appellants appealed.

## ANALYSIS

Appellants contend that the Commission established the Companies' proposed NEM rates in violation of N.C.G.S. § 62-126.4 by (A)(1) failing to conduct an independent "investigation" of the costs and benefits of customer-sited generation and (A)(2) eliminating an existing class of flat-rate NEM customers. Alternatively, Appellants argue that the Commission's order is arbitrary or capricious or unsupported by competent evidence because the Commission (B)(1) failed to consider multiple benefits of customer-sited generation and (B)(2) relied on the MOU, a non-unanimous "settlement agreement."

We review a decision by the Utilities Commission pursuant to N.C.G.S. § 62-94:

> [We] may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or [we] may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

(1) In violation of constitutional provisions, or

(2) In excess of statutory authority or jurisdiction of the Commission, or

(3) Made upon unlawful proceedings, or

(4) Affected by other errors of law, or

(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or

(6) Arbitrary or capricious.

N.C.G.S. § 62-94(b) (2023). "Upon any appeal, the rates fixed or any rule, regulation, finding, determination, or order made by the Commission under the provisions of this Chapter shall be prima facie just and reasonable." N.C.G.S. § 62-94(e) (2023). We may reverse the Commission's decision only upon "strict application of the six criteria enumerated in N.C.G.S. § 62-94(b)":

> Read contextually, therefore, the requirements that "substantial rights have been prejudiced," that error must be prejudicial and that actions of the Commission are presumed just clearly indicate that judicial reversal of an order of the Utilities Commission is a serious matter for the reviewing court which can be properly addressed only by strict application of the six criteria which circumscribe judicial review.

*State ex rel. Utils. Comm'n v. Bird Oil Co.*, 302 N.C. 14, 20 (1981). The appellant bears the burden to demonstrate that the Commission erred as a matter of law and that this error was prejudicial. *See id.* at 25.

We review the Commission's findings of fact to determine whether they are supported by "competent, material, and substantial evidence[.]" *State ex rel. Utils.*

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

*Comm'n v. Cooper*, 368 N.C. 216, 223 (2015). Unchallenged findings of fact are deemed supported by such evidence and are consequently binding on appeal. *Id.* We review the Commission's conclusions of law to determine if they are supported by its findings of fact. *State ex rel. Utils. Comm'n v. Eddleman*, 320 N.C. 344, 352 (1987); *see also Coble v. Coble*, 300 N.C. 708, 714 (1980) ("Evidence must support findings; findings must support conclusions; conclusions must support the judgment. Each step of the progression must be taken . . . in logical sequence . . . .").

## A. Commission's Statutory Duties

Appellants argue that the Commission failed to fulfill its statutory duties under N.C.G.S. § 62-126.4 and, therefore, erred in establishing the Companies' proposed NEM rates. N.C.G.S. § 62-126.4, entitled "Commission to establish net metering rates," mandates the following:

> (a) Each electric public utility shall file for Commission approval revised net metering rates for electric customers that (i) own a renewable energy facility for that person's own primary use or (ii) are customer generator lessees.
>
> (b) The rates shall be nondiscriminatory and established only after an investigation of the costs and benefits of customer-sited generation. The Commission shall establish net metering rates under all tariff designs that ensure that the net metering retail customer pays its full fixed cost of service. Such rates may include fixed monthly energy and demand charges.
>
> (c) Until the rates have been approved by the Commission as required by this section, the rate shall be the applicable net metering rate in place at the time the facility interconnects. Retail customers that own and install an

- 12 -

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

> on-site renewable energy facility and interconnect to the grid prior to the date the Commission approves new metering rates may elect to continue net metering under the net metering rate in effect at the time of interconnection until January 1, 2027.

N.C.G.S. § 62-126.4 (2023).

Appellants' argument that the Commission erred in applying N.C.G.S. § 62-126.4 to the instant case is two-fold. First, Appellants argue that the Commission itself was required to—and did not—perform "an investigation of the costs and benefits of cutomer-sited generation[]" before approving the Companies' proposed rates; that is, no party other than the Commission may perform an investigation of the costs and benefits of customer-sited generation within the meaning of N.C.G.S. § 62-126.4, and the Commission performed no such investigation before it established the Companies' revised NEM rates. Second, Appellants argue that the Commission failed to "establish net metering rates under all tariff designs" by effectively "eliminat[ing] the class of 'flat-rate' NEM customers who paid the same rate for electricity purchased at any time of day" and "requiring all residential NEM customers to participate in [a] TOU [rate] with [Critical Peak Pricing ('CPP')][.]"

**1. Investigation**

In its order, the Commission concluded that the plain and umambiguous language of N.C.G.S. § 62-126.4(b) does *not* require the statutorily-prescribed investigation to be Commission-led:

- 13 -

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

> The Commission also disagrees with the argument that [N.C.G.S. § 62-126.4] requires the Commission to conduct its own investigation of the costs and benefits of customer-sited generation. The statute states that "rates shall be . . . established only after an investigation of the costs and benefits of customer-sited generation." N.C.G.S. § 62-126.4(b). The statute then requires the Commission to establish the rates. *Id.* Nothing in the plain language of the statute mandates that the investigation must be conducted by the Commission, only that an investigation take place prior to rates being established. While the statute provides the Commission with the ability to direct an investigation, nothing in the plain language of the statute requires the Commission, itself, to conduct the investigation. The Commission concludes that the statute only mandates that an investigation be conducted prior to the establishment of rates, which has occurred.

The Companies argue that this conclusion was proper, as N.C.G.S. § 62-126.4 "expressly states when and if it tasks a particular party with performing an activity. For example, it identifies utilities as the parties to 'file for Commission approval' of revised net metering rates, and it identifies the Commission as the party who will 'establish' the revised net metering rates." By contrast, the Companies contend, the statute clearly and unambiguously requires only that "an investigation of the costs and benefits of customer-sited generation[,]" *id.*, be performed "but [] does not task any specific party—much less the Commission—with leading that investigation."

Appellants challenge this conclusion, contending that both the statutory language and "[t]he legislative intent behind [N.C.G.S. §] 62-126.4 make[] clear that the *Commission* must lead an independent cost-benefit analysis into customer-sited generation."

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

We agree with Appellants that the plain language of N.C.G.S. § 62-126.4 clearly and unambiguously requires that it is the *Commission* who must conduct an investigation of the costs and benefits of customer-sited generation before it may establish net metering rates. Therefore, we need not look further than the plain language of the statute to ascertain its meaning:

> "In resolving issues of statutory construction, we look first to the language of the statute itself." *Walker v. Bd. of Trs. of the N.C. Local Gov'tal Emps. Ret. Sys.*, 348 N.C. 63, 65 (1998) (quoting *Hieb v. Lowery*, 344 N.C. 403, 409 (1996)).
>
>> When the language of a statute is clear and without ambiguity, it is the duty of this Court to give effect to the plain meaning of the statute, and judicial construction of legislative intent is not required. *See Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209 (1990). However, when the language of a statute is ambiguous, this Court will determine the purpose of the statute and the intent of the legislature in its enactment. *See Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs of Town of Nags Head*, 299 N.C. 620, 629 (1980) ("The best indicia of that intent are the language of the statute or ordinance, the spirit of the act and what the act seeks to accomplish.").
>
> *Diaz v. Div. of Soc. Servs.*, 360 N.C. 384, 387 (2006). Thus, the initial issue that must be addressed in construing the relevant statutory language requires a determination of whether the language in question is ambiguous or unambiguous.

*Fidelity Bank v. N.C. Dep't of Revenue*, 370 N.C. 10, 18-19 (2017) (parallel citations omitted).

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

As Appellants aptly note, "[n]early every aspect of [N.C.G.S. § 62-126.4] requires that the Commission, not the [electric public utility], take lead on the establishment of new NEM tariffs. For instance, the title of the statute is, 'Commission to establish net metering rates.'" N.C.G.S. § 62-126.4(a) dictates that "[e]ach electric public utility shall file for Commission approval revised net metering rates[.]" N.C.G.S. § 62-126.4(a) (2023). Subsection (a) clearly and unambiguously provides that, after an electric public utility has fulfilled its statutory duty of filing revised net metering rates, those rates are subject to the Commission's approval. *Id.* Subsection (b) then dictates that the Commission shall establish "nondiscriminatory" net metering rates "under all tariff designs that ensure that the net metering retail customer pays its full fixed cost of service[,]" but "*only* after an investigation of the costs and benefits of customer-sited generation." N.C.G.S. § 62-126.4(b) (2023) (emphasis added). Furthermore, subsection (c) provides that the utility's proposed revised rates are without effect unless and until the Commission has approved them. N.C.G.S. § 62-126.4(c) (2023).

N.C.G.S. § 62-126.4 both empowers and requires the Commission—and only the Commission—to establish net metering rates. Furthermore, it requires that the Commission may *only* do so after an investigation of the costs and benefits of customer-sited generation. It is clear from the plain language of the statute that the investigation of the costs and benefits of customer-sited generation contemplated in subsection (b) is to be performed in connection with, and as a prerequisite to, the

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

Commission establishing net metering rates. Notably, the statute makes no reference to the public utility outside of its duty under subsection (a). The statute does not mandate that an investigation of the costs and benefits of customer-sited generation be performed in connection with the utility's filing of revised NEM rates. Despite the contentions of the Companies and the Public Staff, this reading does not require us "to insert language into or read limitations or requirements into [the] statute[]."

The Public Staff contends that, under our holding in *AH N.C. Owner LLC v. N.C. Dept. of Health and Human Services*, 240 N.C. App. 92 (2015), even if we determine that the plain language of the statute does not align with the Commission's interpretation, we must "defer" to the Commission's interpretation that *any* party may perform an investigation of the costs and benefits of customer-sited generation before the Commission establishes net metering rates. *See id.* at 102 ("It is well settled that when a court reviews an agency's interpretation of a statute it administers, the court should defer to the agency's interpretation of the statute as long as the agency's interpretation is reasonable and based on a permissible construction of the statute.") (cleaned up). As the Public Staff notes, however, such deference is appropriate only when we have determined that the statutory language is ambiguous. *Id.* As determined above, the language at issue here is not. Furthermore, such deference, even when appropriate, does not contravene our de novo standard of review for issues of law; "[s]o far as necessary to the decision and

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. v. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

where presented," it is the court who "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action." N.C.G.S. § 62-94(b) (2023). We emphasized the same in *AH N.C. Owner*, where the controlling statute required this Court to "conduct its review of the final decision using the de novo standard of review." *AH N.C. Owner*, 240 N.C. App. at 102.

Even assuming, *arguendo*, that the statute is ambiguous as to the meaning of "investigation," N.C.G.S. § 62-126.4 "must be construed consistently with other provisions of the" Public Utilities Act. *See Jackson v. Charlotte Mecklenburg Hosp. Auth.*, 238 N.C. App. 351, 358 (2014) ("Further, [N.C.G.S.] § 132-1.3 must be construed consistently with other provisions of the Public Records Act.").

N.C.G.S. § 62-37, entitled "Investigations," empowers the Commission to, "on its own motion and whenever it may be necessary in the performance of its duties, investigate and examine the condition and management of public utilities or of any particular public utility . . . either with or without a hearing as it may deem best[.]" N.C.G.S. § 62-37 (2023). "If[,] after such an investigation, . . . the Commission, in its discretion, is of the opinion that the public interest shall be served" by a further investigation, audit, or appraisal, it shall "report its findings and recommendation to the Governor and Council of State" and seek authorization "to order any such appraisal, investigations, or audit to be undertaken by a competent, qualified, and independent firm" of its choosing.

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

Furthermore, N.C.G.S. § 62-126, entitled, in pertinent part, "Investigation of existing rates[,]" provides that,

> [w]henever the Commission, after a hearing had after reasonable notice upon its own motion or upon complaint of anyone directly interested, finds that the existing rates in effect and collected by any public utility are unjust, unreasonable, insufficient or discriminatory, or in violation of any provision of law, the Commission shall determine the just, reasonable, and sufficient and nondiscriminatory rates to be thereafter observed and in force, and shall fix the same by order.

N.C.G.S. § 62-136(a) (2023). This statute not only contemplates another type of "investigation" that the Commission may perform; it also employs phrasing similar to that of N.C.G.S. § 62-126.4. The Public Utilities Act directs the Commission to "make, fix, establish or allow just and reasonable rates for all public utilities subject to its jurisdiction." N.C.G.S. § 62-130 (2023). Furthermore, "[t]he Commission shall from time to time as often as circumstances may require, change and revise or cause to be changed or revised any rates fixed by the Commission, or allowed to be charged by any public utility." N.C.G.S. § 62-136(d) (2023). As part of this duty, the Commission may investigate existing rates to ensure they are not "unjust, unreasonable, insufficient or discriminatory, or in violation of any provision of law[.]" N.C.G.S. § 62-136(a) (2023). N.C.G.S. § 62-136 provides that, "[w]henever the Commission, *after a hearing had* . . . finds that the existing rates" of a public utility "are unjust, unreasonable, insufficient or discriminatory, or in violation of any provision of law, the Commission shall determine . . . and shall fix . . . just, reasonable,

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

and sufficient and nondiscriminatory rates to be thereafter observed and in force[.]" N.C.G.S. § 62-136(a) (2023) (emphasis added).

Here, the Commission concluded that "nothing in the plain language of [N.C.G.S. § 62-126.4] requires the Commission, itself, to conduct" an investigation of the costs and benefits of customer-sited generation because "the statute only mandates that an investigation *be conducted* prior to the [Commission's] establishment of rates[.]" By the Commission's same reasoning, nothing in the plain language of N.C.G.S. § 62-136 would require the Commission, itself, to have a hearing because the statute only mandates that a hearing *be had* prior to the Commission's finding, determination, and order. Such a result, where the Public Utilities Act grants the Commission exclusive authority to set rates for public utilities and empowers the Commission to conduct hearings to this end, is both plainly absurd and in direct conflict with the General Assembly's directives throughout the chapter. *See State v. Beck*, 359 N.C. 611, 614 (2005) ("[W]here a literal interpretation of the language of a statute will lead to absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control and the strict letter thereof shall be disregarded."). Here, too, where the Public Utilities Act grants the Commission exclusive authority to set rates for public utilities and empowers the Commission to conduct investigations to this end, the Commission's interpretation would lead to absurd and contradictory results.

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

We hold that N.C.G.S. § 62-126.4 clearly and unambiguously requires the Commission to first investigate the costs and benefits of customer-sited generation and to then establish net metering rates. Therefore, we must determine whether, under these facts, the Commission did perform such an investigation. Although the Commission did not purport to have done so, the record demonstrates that the Commission de facto performed an investigation of the costs and benefits of customer-sited generation before it established the Companies' proposed revised rates.

As the Commission notes, the statute does not "require that the 'investigation' be in any particular format or using any particular procedure." On 10 January 2022, the Commission entered an *Order Requesting Comments* in this matter, designated as *In the Matter of Investigation of Proposed Net Metering Policy Changes*. As noted by the Public Staff, the Commission established this docket "specifically to evaluate [the Companies'] filings and investigate the cost[s] and benefits of customer-sited generation as presented in the docket with the goal of establishing NEM rates[,]" and the Commission allowed "all interested parties to file comments and reply comments on [the Companies'] proposed revised NEM rates." The Commission then "[found] and conclude[d], based on all the foregoing materials of record, that the requirements established in [2017 North Carolina Laws S.L. 2017-192 (HB 589)] and N.C.G.S. § 62-126.4 have been satisfied in a manner sufficient to enable the Commission to establish new NEM tariffs as mandated by those enactments."

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

We hold that the Commission conducted an investigation of the costs and benefits of customer-sited generation by opening a docket, requesting comments from all interested parties, compiling and reviewing more than 1,000 pages of evidence, and weighing the merits of this evidence to assist in making its final determination.

**2. Tariff Designs**

Appellants further argue that the Commission violated its statutory mandate to "establish net metering rates *under all tariff designs*," N.C.G.S. § 62-126.4(b) (2023) (emphasis added), "[b]y requiring all residential NEM customers to participate in TOU with CPP," thereby "eliminat[ing] the [existing] class of 'flat-rate' NEM customers who paid the same rate for electricity purchased at any time of day." According to Appellants, the Commission was required to—and did not—establish rates that continued to "provide an NEM option for those customers with the flat-rate tariff."

N.C.G.S. § 62-126.4(b) reads, in pertinent part: "[t]he Commission shall establish net metering rates under all tariff designs that ensure that the net metering retail customer pays its full fixed cost of service." *Id.* The Commission determined that "[t]he most natural reading of the language of subsection 126.4(b) is that the Commission is to ensure that under whatever tariff designs net metering *is being offered* the rates set must be sufficient to recover all fixed costs of service[,]" *not* to ensure that rates be set under *all previously offered* tariff designs. The Commission further determined that "the fundamental operative requirement expressly

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

advanced" by the language of N.C.G.S. § 62-126.4 "is to ensure that NEM customers pay their 'full fixed cost of service.'"

We agree with the Commission that N.C.G.S. § 62-126.4 plainly directs the Commission, after its investigation, to establish NEM rates that are "nondiscriminatory[]" and that, "under all tariff designs[,] . . . ensure that the net metering retail customer pays its full fixed cost of service." N.C.G.S. § 62-126.4(b) (2023). "If the statutory language is clear and unambiguous, the court eschews statutory construction in favor of giving the words their plain and definite meaning." *Beck*, 359 N.C. at 614. As the Commission noted, Appellants' proposed reading of the language "is forced and effectively rewrites the sentence . . . as a conjunctive[.]" N.C.G.S. § 62-126.4 does not direct the Commission to establish NEM rates under all tariff designs *and* ensure the NEM customer pays its full fixed cost of service; rather, the statute requires the Commission to establish NEM rates under all tariff designs *that* ensure the NEM customer pays its full fixed cost of service.

To be sure, we note that—even if the statutory language were ambiguous—the General Assembly has declared its purpose in enacting the Distributed Resources Access Act, including N.C.G.S. § 62-126.4:

> The General Assembly of North Carolina finds that as a matter of public policy it is in the interest of the State to encourage the leasing of solar energy facilities for retail customers and subscription to shared community solar energy facilities. The General Assembly further finds and declares that in encouraging the leasing of and subscription to solar energy facilities pursuant to this act,

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

> cross-subsidization should be avoided by holding harmless
> electric public utilities' customers that do not participate in
> such arrangements.

N.C.G.S. § 62-126.2 (2023). "The primary endeavor of courts in construing a statute is to give effect to legislative intent." *Beck*, 359 N.C. at 614. By both its plain language and stated legislative intent, N.C.G.S. § 62-126.4 requires the Commission to establish nondiscriminatory rates that ensure that, under any of the offered tariff designs, the NEM customer will pay its full fixed cost of service.

## B. Order Establishing NEM Rates

As we have determined that the Commission fulfilled its statutory duties, we proceed to determine whether the Commission's *Order Approving Revised Net Metering Tariffs* is proper. The Public Utilities Act empowers the Commission to, *inter alia*, "provide just and reasonable rates and charges for public utility services without unjust discrimination[] [or] undue preferences or advantages . . . and consistent with long-term management and conservation of energy resources by avoiding wasteful, uneconomic and inefficient uses of energy[.]" N.C.G.S. § 62-2(a)(4) (2023). "The General Assembly has delegated to the Commission, and not to the courts, the duty and power to establish rates for public utilities." *State ex rel Utils. Comm'n v. Westco Tel. Co.*, 266 N.C. 450, 457 (1966). Therefore, we review the Commission's order only to determine whether the Commission's findings therein are supported by competent, material, and substantial evidence and whether these findings support its conclusions of law.

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

**1. Costs and Benefits of Customer-Sited Generation**

First, Appellants contend that the Commission's order approving revised net metering tariffs is "arbitrary and capricious" and subject to reversal under N.C.G.S. § 62-94(b)(6) because it "failed to consider multiple material benefits of NEM solar." *See* N.C.G.S. § 62-94(b) (2023) ("[The Court] may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions, or decisions are . . . arbitrary or capricious."). Appellants argue that

> [t]he Commission was presented with substantial evidence about which costs and benefits, under the applicable standard of care, must be considered in any cost-benefit analysis of NEM solar. Instead of grappling with this issue and identifying which costs and benefits should be factored into the cost-benefit analysis, the Commission blindly accepted, without analysis, that the costs and benefits analyzed in the Companies' internal Embedded and Marginal Cost Study were sufficient. The Commission's failure to analyze and make conclusions about this crucial issue—i.e., about exactly which costs and which benefits are relevant—renders the Commission's decision, in violation of [N.C.G.S.] § 62-94(b)(6), arbitrary and capricious.

We begin by emphasizing, as the Commission correctly noted, that "[t]he statute requires an investigation of the costs and benefits of *customer-sited generation*[,]" not "a value of solar study." Appellants contend that the Commission failed to make a "reasoned determination of *which* costs and benefits should be considered," such that its cost-benefit analysis is "by its very nature . . . arbitrary and

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

capricious." While Appellants correctly note that the Commission found that "[t]he analyses in the embedded and marginal cost studies that Duke conducted . . . capture[d] the *majority, if not all*, of the known and verifiable benefits of solar generation[,]" the Commission further specified *which* costs and benefits it deemed appropriate for its consideration. First, the Commission found that

> [t]he record . . . relative to including the benefits of avoided [transmission and distribution ("T&D")] costs in the [Net Excess Energy Credit ("NEEC")[1]] is inconclusive and the Commission will not require that such benefits be added to the NEEC calculations at this time, but rather will revisit the matter in future avoided cost proceedings.

The Commission then "reiterate[d] its position that only *known and measurable benefits and costs* should be included in the determination of the NEEC." The Commission reasoned that it "cannot speculate on future deferrals of T&D costs" and "is also not persuaded that NEM will always provide a grid deferral benefit[]" and found that this uncertainty "alone justifies the exclusion of avoided T&D benefits from the NEEC."

Furthermore, the Commission found that the cost-of-service studies performed at the Commission's request in the Companies' 2019 general rate cases were appropriate for its consideration of "the need for the proposed NEM tariffs" in the

---

[1] The Net Excess Energy Credit, or NEEC, refers to the rate at which the Companies' NEM customer receives credit for the net excess energy generated by that customer and exported to the grid. "The initial NEEC proposed in each new NEM tariff is based upon avoided cost rates approved in" a separate docket. "Duke indicated it will update the NEEC upon the approval of new avoided costs . . . in general rate case proceedings" or "biennial avoided cost proceedings."

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

present docket, as "the cost-of-service studies used for this investigation were the last ones conducted[,] and no costs have been added to base rates since that time[.]"  The Commission also took notice of the "discussion and commentary" in 2022 Carbon Plan proceedings, wherein the Companies "considered, evaluated, and discussed the use of behind-the-meter generation to achieve the goals of [2021 North Carolina Laws S.L. 2021-165 (HB 951)] and the general system benefits of doing so."  The Commission found the information presented during these proceedings to be appropriate for its consideration "in the present docket[,]" as "both HB 589 and HB 951 address review and revision of the present NEM programs[.]"

This Court is without power to require the Commission to adopt the "National Standard Practice Manual for Benefit-Cost Analysis of Distributed Energy Resources" advanced by Appellants in its investigation of the costs and benefits of customer-sited generation.  While "an order which indicates that the Commission accorded only minimal consideration to competent evidence constitutes error at law and is correctable on appeal[,]" the Commission's order synthesizing the parties' arguments and materials, declining to adopt the standards proposed by Appellants, and explaining which costs and benefits it found to be appropriate for its consideration, "is sufficient to show that the Commission gave more than minimal consideration to" Appellants' proposed guidelines.  *State ex rel. Utils Comm'n v. Thornburg*, 314 N.C. 509, 511, 515 (1985).

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

The Commission found that the Companies' "proposal provides an adequate mechanism to reduce the cross-subsidy of fixed cost recovery by incorporating a number of rate design elements[,] . . . including the requirement that NEM customers take service under a time-of-use rate schedule to enable intra-period netting." The Commission then concluded that the Companies' "proposed residential NEM tariffs have met the statutory requirement to develop NEM rates that address [an] NEM customer's full fixed cost of service."

Ultimately, the Commission found and concluded, "based on all the foregoing materials of record, that the requirements established in HB 589 and N.C.G.S. § 62-126.4 have been satisfied in a manner sufficient to enable the Commission to establish new NEM tariffs as mandated by those enactments." We hold that the record contains competent, material, and substantial evidence to support the Commission's findings as to the costs and benefits of customer-sited generation, and these findings support its conclusion that a sufficient investigation was performed such that it may establish the Companies' proposed NEM rates.

**2. Settlement Agreement**

Finally, Appellants contend that the non-unanimous MOU and the non-binding stipulation agreement presented by the Companies "should be given little or no weight." Our Supreme Court has held

> that a stipulation entered into by less than all of the parties
> as to any facts or issues in a contested case proceeding
> under chapter 62 should be accorded full consideration and

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

weighed by the Commission with all other evidence presented by any of the parties in the proceeding. The Commission must consider the nonunanimous stipulation along with all the evidence presented and any other facts the Commission finds relevant to the fair and just determination of the proceeding. The Commission may even adopt the recommendations or provisions of the nonunanimous stipulation as long as the Commission sets forth its reasoning and makes "its own independent conclusion" supported by substantial evidence on the record that the proposal is just and reasonable to all parties in light of all the evidence presented.

*State ex rel. Utils. Comm'n v. Carolina Util. Customers, Ass'n*, 348 N.C. 452, 466 (1998). As determined above, the Commission independently analyzed all materials in the record; made findings of fact supported by competent, material, and substantial evidence; and reached conclusions of law supported by its findings of fact. Therefore, the Commission's consideration of the MOU was appropriate.

## CONCLUSION

The Commission acted pursuant to its statutory authority in establishing the Companies' revised NEM rates. The record indicates that the Commission de facto fulfilled its statutory duty to investigate the costs and benefits of customer-sited generation before establishing the Companies' NEM rates. Furthermore, the Commission properly considered the evidence before it and made appropriate findings of fact and conclusions of law. Appellants have failed to demonstrate that their substantial rights were prejudiced by the Commission's order due to any error

STATE OF N.C. EX REL. UTILS. COMM'N ET AL. V. ENV'T WORKING GRP. ET AL.

*Opinion of the Court*

justifying reversal under N.C.G.S. § 62-94(b), and we modify and affirm the Commission's order establishing the Companies' proposed NEM rates.

MODIFIED AND AFFIRMED.

Judges ARROWOOD and HAMPSON concur.